UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/8/2020

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| BRANDON LISI, | ) |
| Defendant | ) |

CASE NO. 15-CR-457 (KPF)

## MEMO ENDORSED

**EMERGENCY MOTION FOR IMMEDIATE RELEASE FOR BAIL PENDING APPEAL**

NOW COMES THE PETITIONER, Brandon Lisi, the Defendant in this case (hereinafter "Petitioner"), to move this Honorable Court for immediate bail pending appeal as his previous sentence under Judge Buchwald has expired and the Second Circuit just granted a final extension to February 3rd for his reply to be filed in his appeal of this Court's sentence. And, despite this Court's intervention, the BOP has not made Petitioner's legal files available to him as ordered.  As this Court knows well, Petitioner is not a danger to the community or a flight risk, and has already raised several substantive issues in his appeal to the Second Circuit.

Furthermore, the Court is well aware of Petitioner's health issues and the precarious condition of his paralyzed mother from his Motion for Compassionate Release pursuant to 18 U.S.C. §3582(c)(1)(A), which is currently before this Court. Petitioner seeks immediate release on an emergency basis because his mother's condition is worsening, it is unlikely that the Second Circuit will grant Petitioner any more extensions, and the BOP has blatantly ignored this Court's orders both at Ft. Dix and Brooklyn to give Petitioner access to his legal materials. Moreover, as this Court has observed, Petitioner suffers from Sleep Apnea, severe Asthma, and High Blood Pressure that is not being treated by the BOP and is making his appeal difficult, if not impossible. Also, just recently in the past two weeks, several mailings to the Court have either been intercepted

1

by the government or mysteriously disappeared from the Federal Mailbox as they have not been received by the Court or the intended parties, nor have they been returned to Petitioner.

Therefore, Petitioner prays that this Court will grant this necessary and just relief and order his immediate release so that he may gain access to his legal files, answer the Government's response, file his Reply Brief with the Second Circuit, and tend to his critically ill mother as well as his own health needs before it is too late.

## PRELIMINARY STATEMENT

Petitioner's Reply Brief is due February 3, 2020 with no more extensions, and the oral argument has been scheduled for the week of March 2, 2020. Petitioner needs release pending appeal to prepare his reply brief as well as for oral arguments, as he is the only one who can argue at this point. Because Petitioner is clearly not a flight risk or a danger to anyone, the fact that he has several substantive issues means that release pending appeal is mandatory. *See, e.g., United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004). Moreover, Petitioner's own health issues, as well as his Mother's dire condition, is exactly the sort of compelling circumstances envisioned by Congress in passing 18 U.S.C. §3145(c). See Judge Jack Weinstein in *United States v. Dimattina*, 885 F.Supp.2d 572 (E.D.N.Y. 2012) citing to *United States v. DiSomma*, 951 F.2d 494 (2d Cir. 1991). Just as Judge Weinstein determined in *Dimattina*, Petitioner meets all three criteria: not a flight risk or danger to the community; the appeal raises a substantial issue and is not for purposes of delay; and there are exceptional reasons to release pending appeal. *Dimattina* at 583.

As of December 30, 2019, the 78-month sentence imposed by Judge Buchwald was served based on the extra 7 days per year of Good Conduct Time (GCT) provided by the First Step Act (FSA). Petitioner reported to the Camp at USP Canaan on June 19, 2014, and has earned 351 days of GCT credits so that he has fully served the sentence imposed by Judge Buchwald. Obviously,

had the sentence in this case been concurrent as opposed to consecutive, Petitioner would have been home by now because he would have been entitled to 12 months of Halfway House and Home Confinement pursuant to 18 U.S.C. §3624(c), which he did not receive because of this sentence being consecutive. He has served 27 months out of 38 months of his sentence in this case as a consecutive sentence, especially considering the unknown April 16th plea agreement.

In this Motion, Petitioner respectfully asserts that because the Judge Buchwald sentence is over and he is actively on appeal to the Second Circuit on the sentence issued by this Court, he should have the same rights to liberty to effectively prepare his appeal as would any other similarly situated defendant. In this case, the Government is directly affecting Petitioner's liberty interest by preventing him access to his legal materials despite the Court's intervention, and by having the FBI continue to intercept and take Petitioner's mail even when it is sent to this Court. Despite several complaints to the management here, no one seems to be able to find Petitioner's Declaration that was sent out and meant to be filed with Petitioner's Motion for Compassionate release. Other mail by Petitioner has been similarly intercepted and disappeared. But, once Petitioner satisfies his burden that he is not likely to flee or be a danger to the community, and he has at least one substantial issue that might result in a reduced sentence or the vacating of his conviction, then the law under §3143(b) is very clear that Petitioner must be released on bail pending appeal.

In Petitioner's case, he has no less than six substantial issues any one of which could result in a reduced sentence, and it is clear that Petitioner has served 27 of his 38 months in this case, so if he had simply received a "concurrent" sentence rather than a consecutive sentence, he would be serving time at a Halfway House or Home Confinement pursuant to §3624(c). Therefore, Petitioner is the ideal candidate for release pending appeal because he has a spotless prison record and actually served 18 months of Home Detention prior to going to the Camp at Canaan, which is time

he never received credit for. Had he received credit for that time from the BOP or Judge Buchwald, he would also be serving Halfway House or Home Confinement time now rather than being in a Maximum Security prison cell at MDC Brooklyn without access to his legal files.

Moreover, this Court knows well that Petitioner's Mother is suffering and that §3145(c) provides release for other circumstances, which clearly exist in this case. Therefore, because Petitioner meets all of the requirements of §3143(b), he prays that this Court will take those circumstances into account and issue an immediate order for his release so that Petitioner can take his legal files home and take care of his Mother as well as his appeal in the Second Circuit in the interests of justice.

## LEGAL STANDARD

A reviewing court considering a defendant's request for release pending appeal must make two determinations: (1) whether "the appeal raise[s] a substantial question of law or fact and (2) whether, "if the substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal" or a reduced sentence. An issue is "substantial" if it is "not frivolous"—if it "is a close question or one that very well could be decided the other way." *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985). Under the Bail Reform Act of 1984, 18 U.S.C. §§3141 *et seq.*, a defendant who "can make the required evidentiary showing" enjoys a "right to liberty that is…mandatory." *United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004). "If a defendant meets this substantial burden, bail pending appeal is mandatory." Whether or not the defendant's appeal presents a "close" question is to be decided on a case-by-case basis. "[L]ikely to result in reversal or an order for a new trial" requires "that the claimed error not be harmless or unprejudicial." The issues to be raised in Petitioner's appeal amply satisfy this standard.

The latter part of the second requirement that the appeal raises a substantial question of law or fact likely to result in a reversal or order for a new trial does not mean that the district court must "predict the probability of reversal." *Randell* at 124 (*quoting United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985)). The requirement goes to "the significance of the substantial issue to the ultimate disposition of the appeal." *Id.* To determine whether this requirement is satisfied, a court must first determine whether the question on appeal is substantial. *Id.* at 125. Entitlement to bail pending appeal does not require a finding that the district court erred, or that reversal is the most likely outcome on appeal. If the question is substantial, a court "must then consider whether that question is so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial." *Randell* at 125 (*quoting Miller* at 23).

The Second Circuit has made clear that "likely to result" in reversal or new trial does not mean that a defendant must be likely to succeed on appeal. Rather, the court need only find the presence of a substantial question that, if resolved in Petitioner's favor, would result in reversal or a lower sentence. *Randell* at 124-25; §3143(b)(1)(B). Petitioner's appeal will certainly raise many major issues and substantial questions, all of which are "of more substance than would be necessary to a finding that it was not frivolous" … and/or present "a close question or one that very well could be decided the other way." *Randell* at 125 (*quoting United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)); *see also United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985) ("[A] substantial question is one that is fairly debatable." Put differently, "the test under §3145(c) is necessarily a flexible one, and district courts have wide latitude to determine whether a particular set of circumstances qualifies as exceptional. ("[I]t is well within the district judge's discretion to find that exceptional reasons allow release of the defendant [convicted of a violent

crime] pending appeal."). *DiMattina* at 589, *citing DiSomma* at 498. If Petitioner's appeal is successful, his sentence could be reduced or made concurrent rather than consecutive. In either scenario, he would be eligible for release.

## ARGUMENT

### I.   EXCEPTIONAL REASONS MERIT PETITIONER'S RELEASE PENDING APPEAL

Petitioner respectfully submits to the Court that he could possibly reverse his conviction based on the Improper Venue argument raised on appeal, but clearly the facts and conduct leading to this case were part and parcel of the conduct that resulted in the 78 month sentence from Judge Buchwald, so the 38 month sentence in this case should have been concurrent and not consecutive. Petitioner has already served 27 months of that sentence, so had it been concurrent instead of consecutive, with Good Time Credits Petitioner would be asking for immediate release right now pursuant to §3624(c), which guarantees that all inmates are entitled to 12 months of Halfway House and Home Confinement to help ease their reentry into society.

Since there is no question that Petitioner does not pose a flight risk or a danger to the community, and he is one of the few inmates anywhere with a spotless prison record which is made even more incredible in that he has done most of his time as "hard time" at Ft. Dix and now Brooklyn MDC rather than the Camp at Canaan; Petitioner seeks to rely on the fact that he may be successful on the issue that his sentence should have been concurrent, meaning that he would now have served his entire sentence before the Second Circuit rules in his favor. Petitioner believes he has an excellent chance to win a reduced sentence, and this Court should grant this Petition for immediate release pending appeal for the facts enumerated above.

Aside from this, Petitioner also has extraordinary and compelling reasons for his release while his appeal is pending. In granting the bail pending appeal request of the defendant who was

a known gangster in *Dimattina*, distinguished jurist Judge Jack Weinstein cited to the Second Circuit's decision in *DiSomma*, stating that:

> *"the trial judge"* must determine whether there are "exceptional circumstances making detention inappropriate," and…that the "exceptional reasons provision [is] to be applied on original application despite inclusion of [the] provision in a section generally covering appeals." ("[I]t is well within the *district judge's discretion* to find that exceptional reasons allow release of the defendant [convicted of a violent crime] pending appeal. (emphasis in original)). *Dimattina* at 496, 498.

Judge Weinstein recognized that exceptional reasons merit a defendant's release pending appeal even if the Judge is convinced that he made no mistakes and the defendant is guilty. *See, also*, §1345(c). In this case, Petitioner has not only his own health problems but also the terrible conditions that his mother is living under.  She literally had no one to feed her on Christmas Day, nor has BOP management budged on providing Petitioner with his legal files. There is no viable reason not to grant Petitioner's motion for bail pending appeal so that he can gain access to his legal files, file his reply in the Second Circuit, and at the same time take care of his mother while attending to his own healthcare needs with professional doctors.

## II.   PETITIONER WAS ALSO THE VICTIM OF INEFFECTIVE ASSISTANCE OF COUNSEL AS DESCRIBED BY THE SECOND CIRCUIT IN *GALANIS* AND THE SUPREME COURT IN *LEE*

In *United States v. Galanis*, 759 Fed.Appx. 88 (2d Cir. 2019), the Second Circuit found the defendant's attorneys offered Ineffective Assistance of Counsel in facts remarkably similar to this case, including the involvement of Attorney Lisa Scolari and the existence of two different plea agreements where the defendant had no knowledge of the clearly better and more beneficial agreement. Just as in this case, the defendant in *Galanis* received a consecutive sentence and had a higher criminal history score than he should have. Similarly, as in *Galanis*, Petitioner never saw the April 16, 2013 Plea Agreement that covered all of his post-arrest conduct until Attorney Scolari sent it to him at Fort Dix, after he had already pled guilty via video conferencing on April 3, 2017.

Needless to say, Petitioner was very upset with Attorney Scolari, and as this Court knows, Attorney Scolari asked to be removed from the case. But, before her exit, she sent an email to Petitioner agreeing that Petitioner should have his new attorney move to withdraw his guilty plea based on the far more favorable April 16th Plea Agreement. The only reason Attorney Grob did not do this was because he was extremely confident that this Court would issue a "concurrent" sentence based on the fact that all of the conduct in Petitioner's three federal cases involved the same parties and properties as determined by the Sentencing Guideline and based on the April 16th Plea Agreement; clearly encompassing the conduct in front of this Court.

While it is clear that Attorney Zelin was the real culprit in all of this and clearly had a massive conflict of interest, both Attorney Scolari and Attorney Grob each provided their own Ineffective Assistance of Counsel according to *Galanis*, where the Second Circuit explains the Supreme Court's decisions in *Lafler* and *Frye*:

> Ineffective-assistance claims regarding plea offers are covered by the familiar two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The defendant must show that (1) his attorney's performance was deficient and (2) the deficient performance prejudiced him. *Missouri v. Frye*, 566 U.S. 134, 140 (2012). In the context of plea offers, counsel performs deficiently when he fails to (1) "communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused," *id* at 145, or (2) "inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed," *Purdy v. United States*, 208 F.3d 41, 44-45 (2d Cir. 2000) (*citing United States v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998) ). To prove prejudice, the defendant must show that, but for the counsel's errors, there is a reasonable probability that (1) he would have accepted a plea offer, (2) the plea offer would not have been withdrawn by the prosecution in light of intervening circumstances, (3) the court would have accepted the terms of the plea offer, and (4) "the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Lafler v. Cooper*, 566 U.S. 156, 164 (2012); *see also Fulton v. Graham*, 802 F.3d 257, 265 (2d Cir. 2015). *Galanis* at 91.

Petitioner also respectfully asks that this Court consider the facts of the Supreme Court's decision in *Lee v. United States*, 137 S.Ct. 1958 (2017), which involved a 2255 petition. Had

Petitioner known he was going to prison for 38 months consecutive to the previous sentence, he never would have accepted the plea deal. In *Lee*, a Korean-born businessman who never went back to Korea and who also never became a U.S. citizen, got caught selling Ecstasy but was only sentenced to one year, whereas Petitioner received 38 months.  *Lee* makes it clear that Petitioner's attorneys were beyond any doubt constitutionally "ineffective" in this case:

> The Sixth Amendment guarantees a defendant the effective assistance of counsel at "critical stages of a criminal proceeding," including when he enters a guilty plea. *Lafler* v. *Cooper*, 566 U.S. 156, 165 (2012).  To demonstrate that counsel was constitutionally ineffective, a defendant must show that counsel's representation "fell below an objective standard of reasonableness" and that he was prejudiced as a result. *Strickland* at 688, 692. The first requirement is not at issue in today's case: The Government concedes that Lee's plea-stage counsel provided inadequate representation when he assured Lee that he would not be deported if he pleaded guilty. The question is whether Lee can show he was prejudiced by that erroneous advice.  *Lee* at 1964.

In *Lee*, the government conceded that the attorney was "ineffective" in advising Lee that he would not be deported.  But, unlike in Petitioner's case, Lee's attorney negotiated a one-year sentence and gave him a copy of his Pre-Sentence Investigation Report (PSR), which to this date Petitioner has never seen or been provided a copy of because if he had, he would not have pled guilty. And, unlike Petitioner, the defendant in *Lee* was caught selling a drug that he and everyone else knew to be illegal.  Simply put, Petitioner can clearly show under *Strickland* that his counsel's representation "fell below an objective standard of reasonableness" and that he was prejudiced as a result. *See Lee* at 1964, *quoting Strickland* at 688, 692.  If the defendant in *Lee* satisfied both prongs of *Strickland*, then surely Petitioner's situation satisfies both prongs as well, and this Court must find in Petitioner's favor in the interests of justice.

That leaves the Court with only the "prejudice" prong of *Strickland*.  While the defendant in *Lee* focused the Supreme Court's attention on *Lafler* stating that "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial," Petitioner can easily

prove "prejudice" because he pleaded guilty and received an unreasonably long sentence by any standard. Because Lee, unlike Petitioner, had no credible defense or even a good argument for trial, the Sixth Circuit affirmed his conviction which, of course, led to Lee's appeal to the Supreme Court based on *Padilla v. Kentucky*, 559 U.S. 356 (2010). In this case, Petitioner had Speedy Trail and Venue arguments that his grossly ineffective counsel did not raise.

Because of Lee basing his argument on the *Padilla's* "deportation penalty standard," the government argued that under *Padilla* the defendant "must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla* at 372. Thus, it was the government's argument that Lee would be deported either way, with a one year plea deal or with a longer sentence after he lost at trial. In rejecting the government's argument, the Supreme Court concluded that Lee had demonstrated a reasonable possibility that "but for his counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Lee* at 1964, *quoting Hill* at 59.

Petitioner has a very substantial argument that Attorney Scolari was ineffective by not showing him the April 16, 2013 Plea Agreement, much less advising him on whether to take the deal. Therefore, he received no help negotiating a better deal as required by *Lafler* and *Frye* ("[C]ounsel's advice with respect to the plea offer fell below the standard of adequate assistance of counsel guaranteed by the Sixth Amendment, applicable to the States through the Fourteenth Amendment."). *Lafler* at 164, *quoting Frye* at 140. At the very least, this Court should have held a *Frye* hearing as many other courts have begun to do. Similarly, Attorney Grob was also ineffective in his advice and decision not to withdraw Petitioner's plea: "If a plea bargain has been offered a defendant has the right to effective assistance of counsel in considering whether to accept it." *Lafler* at 168. Therefore, since Petitioner's case is much clearer and much more dramatic and

on all fours with *Galanis*, he respectfully asks this Court to order his immediate release on Bail Pending Appeal so that he can take care of his Mother as well as his own health issues (like the CPAP machine that the BOP has never given him a plug and an extension cord for, except during two days during a blackout), while working on his appeal before the Second Circuit next month.

## III.   PETITIONER SHOULD HAVE HAD A CONCURRENT SENTENCE AS A MATTER OF LAW

There can be no doubt that Petitioner was entitled to a "concurrent" sentence under the Sentencing Guidelines, and it was Plain Error for the Court not to have made Petitioner's sentence "concurrent" to the previous sentence given by Judge Buchwald. Dkt. No. 112, page 31; U.S.S.G. §§1B1.3, 5G 1.3(c). *See Rosales-Mireles v. United States,* 138 S.Ct. 1897, 1902 (2018), *quoting Molina–Martinez v. United States,* 136 S.Ct. 1338, 1348 (2016) ("An error resulting in a higher range than the Guidelines provide usually establishes a reasonable probability that a defendant will serve a prison sentence greater than "necessary" to fulfill the purposes of incarceration, 18 U.S.C. §3553(a)."). Even a cursory glance at the government's own sentencing memorandum makes clear that the alleged criminal conduct in this case was all part and parcel of the original crimes alleged in both the Buchwald Indictment and the Swain Indictment.

In fact, the Indictment in this case reads virtually word for word as the government's December 2012 *ex parte* letter requesting that Petitioner be locked up rather than remaining on bail because of his post-arrest conduct. In retrospect, it would have been better for Petitioner to have been "locked up" then, because neither Judge Buchwald nor this Court gave Petitioner any credit for the 18 months he was under House Arrest and Detention with an ankle bracelet. Similarly, the April 16, 2013 Plea Agreement that the criminally-conflicted Attorney Zelin never showed Petitioner is all about the "post-arrest" conduct that is exclusively what the Indictment in this case was about. The "loss mitigation strategy" that the government claims was criminal was

the brain child of Attorney Zelin, and if it was a crime, then he was the criminal mastermind and he was the one that held all the meetings with the victims, not Petitioner.

Moreover, the $150,000 "stolen" from the Widow was used to pay Attorney Zelin and Attorney Naiberg's legal fees. It was Attorney Zelin that represented Petitioner in the early negotiations of this case, and the PROMISE that the government breached was their commitment to have a meeting to discuss the "post arrest" conduct with Attorney Zelin before they did anything further to Petitioner. Despite the government's repeated denials that they did nothing wrong, in Petitioner's Appeal there is a letter from the government dated April 15, 2015 acknowledging that they have a "*Lafler*" problem in the same year that *Lafler* and *Frye* were decided by the Supreme Court. This came fully five years before Petitioner was sentenced in 2017, which is clearly a far worse Due Process Delay than was present in Rocky Moore's case, a convicted murderer that had a delay of only 28 months while he was being held for murder.  As the Supreme Court stated in a unanimous decision dismissing the indictment of a convicted killer, Rocky Moore:

> Moreover, prejudice to a defendant caused by delay in bringing him to trial is not confined to the possible prejudice to his defense in those proceedings. Inordinate delay, wholly aside from possible prejudice to a defense on the merits, may seriously interfere with the defendant's liberty, whether he is free on bail or not, and…may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends. These factors are more serious for some than for others, but they are inevitably present in every case to some extent, for every defendant will either be incarcerated pending trial or on bail subject to substantial restrictions on his liberty. *Moore v. Arizona*, 414 U.S. 25, 27 (1973), *citing United States v. Marion*, 404 U.S. 307, 320-21 (1971).

Additionally, the Court must consider the disparity of sentences in this case because Ms. Arvanitakis, the lead defendant, received a Guidelines Amendment 794 Mitigating Role Adjustment and only a 24 month sentence, while Paul Katsaros received only 90 days at Otisville Camp. For example, as the Second Circuit described Amendment 794 in *United States v. Soborski*, 708 Fed.Appx 6 (2d Cir. 2017):

Under §3B1.2 of the Guidelines, a defendant's offense level is reduced by two levels if he was a minor participant in any criminal activity, four levels if a minimal participant, and three levels if falling somewhere between those two categories.

The Second Circuit went on to describe Amendment 794's impact on sentencing for "participants" in a "criminal activity" or in a many-participant conspiracy as is alleged here:

> Amendment 794, which became effective in November 2015, less than a year before Soborski's sentencing, modified significantly-especially within this Circuit-the factors that a district court should consider in deciding whether to apply the reduction. It added to the Guidelines commentary the following non-exhaustive list of factors that the district court "should consider" among the "totality of the circumstances":
>
> (i)  the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii)  the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii)  the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
>
> (iv)  the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
>
> (v)  the degree to which the defendant stood to benefit from the criminal activity.

Moreover, Amendment 794 also clarified that a reduction for a minor role is not necessarily precluded by a defendant's performance of "an essential or indispensable role in the criminal activity," and that a defendant with an essential or indispensable role may still receive a mitigating role reduction if he or she was "substantially less culpable than the average participant in the criminal activity." Respectfully, Petitioner asserts that he never had a leadership role and that he raises a number of issues that could result in a reduced sentence if they are decided in his favor, and therefore he should be granted immediate release pending his appeal with the Second Circuit.

## IV.   VENUE WAS CLEARLY IMPROPER IN THIS CASE

This case was commenced in the Southern District of New York. However, Petitioner took

issue with the fact that the case was brought in the Southern District of New York and refused to

stipulate to the venue in his plea agreement. Venue was discussed at several critical points during

the plea colloquy which shows that (a) Petitioner never agreed with venue and (b) the Government

couldn't establish it:

> THE COURT: Ms. Reilly, is this a situation in which there is venue in the Southern District
> of New York or was venue waived?

> MS. REILLY: There is venue in the Southern District, Your Honor.

> THE COURT: Mr. Lisi, just to be clear, what I mean by that is, the Government would
> also have to prove by a lesser standard, a preponderance of the evidence standard, that
> some piece of that conduct took place in the Southern District of New York, which would
> include Manhattan, the Bronx, Westchester County, and certain counties north of that. Do
> you understand that, sir?

> THE DEFENDANT: Yes, Your Honor

> THE COURT: Sir, did either of these banks or did this transaction take place in the
> Southern District of New York?

> MS. SCOLARI: Your Honor, the government may have to add to that. I don't know if Mr.
> Lisi can answer the venue issue.

> THE COURT: Mr. Lisi, let me just repeat to you what Ms. Scolari just said. One of the
> issues that I must address is whether or not venue has been met. I don't know if you have
> an awareness of any conduct taking place in Manhattan or Westchester or the Bronx.
> Perhaps what I'll do, instead, is, I will get the government's proffer regarding venue in this
> case. Is that all right, sir?

> THE DEFENDANT: Yes, Your Honor.

> THE COURT: Ms. Reilly.

> MS. REILLY: Certainly, Your Honor. The government proffers that if we were to proceed
> to trial in this matter the Government would introduce evidence that certain actions in
> furtherance of the conspiracy took place in the Southern District of New York; specifically,
> that at least one or more victims of the conspiracy caused money to be transferred from a

bank located in Manhattan and that a coconspirator and a victim of the conspiracy met with an attorney seeking to further the objects of the conspiracy at an office in Manhattan.

THE COURT: Mr. Lisi, were you able to hear the prosecutor a moment ago?

THE DEFENDANT: For the most part, Your Honor, yes.

THE COURT: What she indicated to me was that the transfer from one bank to another involved a bank that was located in Manhattan and that there was as well a meeting with both a coconspirator and a victim of the conspiracy that took place at an office in Manhattan. That would seem to satisfy the venue obligation. Do you agree, sir?

THE DEFENDANT: OK, Your Honor.

THE COURT: I don't want you to just agree with me.

THE DEFENDANT: Yes, Your Honor.

MS. SCOLARI: Your Honor, I guess I would just reiterate that Mr. Lisi doesn't know. That's why we have asked the Government to proffer. I certainly don't object to what the Government has said.

As this Court can clearly see, all that occurred was that the Government asserted their position and Petitioner didn't waive the issue of venue. Further yet, at the time of the hearing, Petitioner didn't know the answer to the question, and apparently his former Attorney, Lisa Scolari, failed to know either. The Government's proffer was insufficient to establish venue, and that is yet another reason that this Court should grant Petitioner the relief that he seeks in this Motion. A mere recital of what is intended to be said at trial is not enough. The Government didn't give an address or a location within the District. Instead, the Government merely stated that it would show some actions occurred within the District. As it turns out, the Government could not have made such a showing, and as such it was error for to have blindly relied on the Government's fatally flawed and inadequate proffer to establish venue by a preponderance of the evidence.

This point is especially vital, when one considers the fact that "[a] defendant in a criminal case has a right to be tried .in the district where the crime was committed." *United States v. Lange,*

15

835 F.3d 58, 68 (2d Cir. 2016); *see also United States v. Tzolov*, 642 F.3d 214 (2d Cir. 2011); U.S.

Const. amend. VI; Fed. R. Crim. Proc. 18. Where, like here, the statute fails to specify instructions

on how to determine a specific venue location of the crime, "the *locus delicti* must be determined

from the nature of the crime alleged and the location of the act or acts constituting it." *Id.* The

Government bears the burden of proving venue by a preponderance of the evidence. *Tzolov* at 218.

Importantly, "[v]enue is only proper where the acts constituting the offense the crime's essential

conduct elements took place." *Id.*

　　This fact is made especially clear, when one also considers the fact that Petitioner never

waived venue, since Petitioner could never have (and thus did not) waived something (venue) that

the record shows that he was not aware of, had no knowledge of, and thus was not voluntarily

waiving. Instead, the Government had to try and establish venue, but could not since there were

no locations in the Southern District of New York to point to. The plea agreement is invalid

because Petitioner did not know about or was not properly advised of the April 16, 2013 plea offer

thus abrogating any waiver in the later plea, along with the fact that he never voluntarily waived

venue and was admittedly unknowing of the venue at issue in this case.  Combining the invalid

plea agreement with the fact that the Rule 16 material contradicts the Government's proffer, and

that the Government did not offer any actual evidence of venue and the Court did not hold a proper

evidentiary hearing, venue is therefore improper in this case and as such the Southern District of

New York did not have jurisdiction. Therefore, the Southern District of New York was never the

proper Venue for this case, and that is the type of issue that might result in a reversal of Petitioner's

conviction for the reasons below, and therefore warrants Bail Pending Appeal for the Petitioner

and the granting of this Motion.

Contrary to the Government's assertions that Petitioner waived Venue, that is clearly not the case. Improper Venue would be a constitutional argument that can never be waived, *Johnston v. Zerbst,* 304 U.S. 458 (1938), and it would be a "structural error" that would require reversal. *Weaver v. Massachusetts,* 137 S.Ct. 1899 (2017). The alleged criminal conduct of the following Counts occurred outside the Southern District of New York, so Venue was not proper in this district, and therefore a judgment of acquittal must be entered as to all of these counts as a matter of law. Both Rule 18 of the Federal Rules of Criminal Procedure and the Constitution require that a person be tried for an offense where that offense is committed. Indeed, the Constitution protects a criminal defendant's right to proper venue in two places: Article III, and the Sixth Amendment. *United States v. Cabrales,* 524 U.S. 1, 5 (1998); *see also United States v. Anderson,* 328 U.S. 699, 703 (1946) ("[T]he locus delicti must be determined from the nature of the crime alleged and the location of the act or acts constituting it."). In a criminal case, "venue must be narrowly construed." *United States v. Jefferson,* 674 F.3d 332, 365 (4th Cir. 2012). "Venue is an element which must be proved by a preponderance of the evidence." *United States v. Miller,* 111 F.3d 747, 749-50 (10th Cir. 1997).

When an indictment charges a defendant with multiple counts, "venue must be proper with respect to each count." *United States v. Beech-Nut Nutrition Corp.,* 871 F.2d 1181, 1188 (2d Cir. 1989). Nowhere in the Indictment does the government allege the facts sufficient to show any criminal activity by Petitioner anywhere, nor were any of the elements of Venue discussed at trial, much less proven beyond a reasonable doubt. Nowhere in the Indictment does the government allege the necessary "core of criminality" that occurred in the Southern District of New York. *See United States v. Brennan,* 183 F.3d 139 (2d Cir. 1999). There is an insufficient nexus for said counts to be prosecuted in the Southern District of New York, and the government must prove

17

Venue with a preponderance of the evidence, which is impossible in this case just based on the conclusory allegations made by the government in the Indictment. Hence, all of these specific counts should be dismissed for lack of proper venue, and especially as to Petitioner the Indictment must be dismissed in its entirety because he had nothing to do with these actions. *See United States v. Auernheimer*, 748 F.3d 525 (3d Cir. 2014).

As explained in *Auernheimer*, these constitutional protections as to venue manifest a strong constitutional policy disfavoring trials removed from the situs of the alleged criminal activity. Petitioner did nothing wrong, illegal, or criminal in the Southern District of New York, and that means even as part of a conspiracy, the Southern District of New York is not only the wrong jurisdiction for this case, but also the wrong venue. "Venue is proper only where the acts constituting the offense the crime's 'essential conduct elements' took place." *Tzolov* at 218 (referencing *United States v. Rodriguez-Moreno*, 526 U.S. 275, 280 (1999)). "[T]he site of a charged offense must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Anderson* at 703.

The Second Circuit has enumerated four factors used to determine whether venue is constitutionally permissible: (1) the site of the defendant's acts; (2) the elements and nature of the crime; (3) the locus of the effect of the criminal conduct; and (4) the suitability of the district for accurate fact finding. *United States v. Reed*, 773 F.2d 447, 481 (2d Cir. 1985); *see, also, Beech-Nut, supra*. "Where a federal statute defining an offense does not explicitly indicate where a criminal act is deemed to have been committed, the site of a charged offense must be determined from the nature of the crime alleged and the location of the act or acts constituting it." "[V]enue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would

occur in the district of venue." *United States v. Geibel*, 369 F.3d 682, 696 (2d Cir. 2004). *See, also, Brennan* at 147 (holding that "prosecution under the mail fraud statute is permissible only in those districts in which a proscribed act occurs").

In *Geibel,* the Second Circuit vacated the defendant's convictions for counts 2-82 because the government failed to prove that the defendant did the allegedly illegal trades on the AMEX, which would have arguably made the Southern District of New York an appropriate venue for the trial. The Second Circuit cited *Rosenblatt* for the proposition that the traders involved in the illegal trading could not be in a conspiracy just because they knew some of the people:

> Similarly, in this case, defendants' awareness of *Freeman,* the source of information, is not sufficient evidence to link them in a conspiracy with Freeman because mere awareness does not satisfy the conspiracy requirement that two parties act in concert toward a common goal. *See United States v. Rosenblatt,* 554 F.2d 36, 38 n.2 (2d Cir. 1977) (holding that federal definition of conspiracy retains traditional, common law requirement of "bilateral" formation which mandates a "meeting of the minds"). *Geibel* at 692.

Although there were eight defendants charged in the conspiracy to trade on inside information, it was clear that not every trader was involved in every trade.  Furthermore not all of the trades happened on the New York exchanges, but the Second Circuit determined that there was enough evidence to show that Geibel was part of the conspiracy and made certain trades based on tips and insider information. The Second Circuit then went on to review if Venue was proper for each and every count of the indictment:

> This Court reviews a district court's ruling regarding venue de novo. "Because it is not an element of the crime, the government bears the burden of proving venue by a preponderance of the evidence." *United States v. Smith,* 198 F.3d 377, 382 (2d Cir. 1999). This Court reviews the sufficiency of the evidence as to venue in the light most favorable to the government, crediting "every inference that could have been drawn in its favor." *United States v. Rosa,* 17 F.3d 1531, 1542 (2d Cir. 1994).

> Where a federal statute defining an offense does not explicitly indicate where a criminal act is deemed to have been committed, the site of a charged offense must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Cabrales* at 5. "[V]enue is proper in a district where (1) the defendant intentionally or

knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue." *Id.* at 483. Finally, "when a defendant is charged in more than one count, venue must be proper with respect to each count." *Beech-Nut* at 1188. "In a conspiracy prosecution, venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators. The defendant need not have been present in the district, as long as an overt act in furtherance of the conspiracy occurred there." *Smith* at 382. In this case, Freeman was not a member of defendants' conspiracy, and thus his acts in New York cannot form the basis for venue in the Southern District of New York. *Geibel* at 696.

The reason that the defendant's convictions on so many counts (the eighty substantive insider trading counts) were overturned is because while Freeman was in New York, another conspirator, Cooper, was in Kentucky, and while cash payments were made to Freeman in New York; that did not create proper venue in New York for the traders outside New York just because they worked with Freeman.. The Second Circuit in *Geibel* used *Cabrales* to show that just because Freeman was in New York; that did not make New York the proper venue for all of the counts or all of the illegal trades:

> In *Cabrales*, the Supreme Court held that Missouri was not a proper venue for money laundering offenses even though the laundered funds originated from criminal activity in Missouri. *Id.* at 3-4, 10. The Court found that, even though the scheme originated in Missouri, the actual crime charged against the defendant began, continued, and was completed in Florida. *Id.* at 7-9. Analogously, although Freeman's actions ultimately resulted in defendants trades, his conduct was too anterior and remote to confer venue in the SDNY. Indeed, as Geibel aptly notes, to hold otherwise "would be to in effect grant the Southern District of New York carte blanche on venue in virtually all insider trading cases." *Geibel* at 697.

Simply put, when the government submitted evidence of a letter from the AMEX showing the brokers involved with the trade, neither Geibel's name nor his partner's name was listed as having been involved with the trades, therefore all of the insider trading convictions for Geibel had to be vacated. The same is true in this case. Petitioner was not involved in any way with the Southern District of New York, so Venue was not proper for any of the counts in this case and Petitioner should be granted Bail Pending Appeal.

*United States v. Bezmalinovic*, 962 F. Supp. 435 (S.D.N.Y. 1997) is also instructive because the court dismissed a bank fraud charge for lack of venue. The indictment charged a scheme to defraud Manufacturers Hanover Trust ("MHT") by obtaining a mortgage using a false application. Bezmalinovic allegedly prepared a false application in the Eastern District of New York ("E.D.N.Y."), submitted the application to MHT in the E.D.N.Y., received proceeds via checks drawn on an account in the E.D.N.Y., and then deposited those checks into his account in the E.D.N.Y. The government argued that venue was proper in the S.D.N.Y. because, after the checks were deposited into a Chemical Bank account in the E.D.N.Y., the checks were sent to a processing center in Manhattan where each check was credited to Bezmalinovic's account, and each check was then forwarded to a clearing house in Manhattan.

Finally, the checks were sent to MHT's processing center in Manhattan, where they were debited from MHT's closing account. However, the court in Bezmalinovic did not agree with the government's determination of venue and held that the ministerial processing of the checks in Manhattan did not provide a sufficient constitutional basis for venue in the S.D.N.Y. The court further noted that the "only acts alleged to have occurred in the [S.D.N.Y.] are the ministerial actions taken by MHT and Chemical Bank in the process of crediting defendant's account." *Id.* at 437. In addition, the court stated that the indictment did "not allege[] that those acts were intended or foreseen by defendant." *Id.* The court concluded that the ministerial acts of debiting and crediting accounts as alleged in the indictment did not constitute "substantial contacts" with the S.D.N.Y. sufficient for venue to be constitutionally permissible. *Id.* at 441.

Moreover, in *United States v. Novak*, 443 F.3d 150 (2d Cir. 2006), the defendant challenged jurisdiction in the E.D.N.Y. when the evidence showed (and the government agreed) that the alleged offenses took place in the S.D.N.Y.; just one subway stop away. In this case, the Indictment

clearly shows that all of the alleged frauds were committed outside of the S.D.N.Y. in Long Island

of the E.D.N.Y., and therefore the S.D.N.Y. was not the proper venue for any of these Counts on

that basis alone. Just as in *Novak*, where the defendant had his conviction for an ERISA violation

reversed and vacated because of improper venue by the Second Circuit, thereby making Bail

Pending Appeal mandatory for Petitioner. *See Abuhamra* at 319.

### CONCLUSION

For the reasons stated above, Petitioner respectfully requests that he be released on bail

pending the appeal of his case before the Second Circuit, so that he may present his best defense

while also helping his mother with her myriad health issues and being able to address his own

issues,

Dated: January 10, 2020                                    Respectfully Submitted,
at Brooklyn, New York

                                                           /s/ Brandon Lisi
                                                           Brandon Lisi
                                                           Reg. No. 62739-054
                                                           Defendant, Pro se
                                                           MDC Brooklyn
                                                           P.O. Box 329002
                                                           Brooklyn, NY 11232

The Court is in receipt of Defendant's Emergency Motion.  The Court
ORDERS the Government to respond to Defendant's motion by J**anuary 23,
2020**.

Dated:    January 9, 2020
          New York, New York
                                            SO ORDERED.

                                            Katherine Polk Failla

                                            HON. KATHERINE POLK FAILLA
                                            UNITED STATES DISTRICT JUDGE

22