No. 15-cr-00457

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**UNITED STATES OF AMERICA,**
**Respondent,**

**v.**

**BRANDON LISI**
**Petitioner.**

---

# MOTION FOR RECONSIDERATION OF THIS COURT'S DENIAL OF PETITIONER'S MOTION FOR REDUCTION IN SENTENCE AND/OR COMPASSIONATE RELEASE

---

Brandon Lisi
Petitioner, *Pro se*
Incarcerated Inmate
Reg. No. 62739-054
MDC Brooklyn
P.O. Box 329002
Brooklyn, NY 11232

1

|  |  |
|---|---|
| ) | |
| UNITED STATES OF AMERICA ) | |
| Respondent ) | |
| v. ) | CASE NO. 15-cr-00457 |
| ) | |
| BRANDON LISI, ) | |
| Petitioner ) | |
| ) | |

## MOTION FOR RECONSIDERATION OF THIS COURT'S DENIAL OF PETITIONER'S MOTION FOR REDUCTION IN SENTENCE AND/OR COMPASSIONATE RELEASE

NOW COMES THE PETITIONER, Brandon Lisi (hereinafter the "Petitioner" or Mr. Lisi), to respectfully ask this Court to reconsider and amend its judgment denying Petitioner's Motion for Reduction in Sentence and/or Compassionate Release (Dkt. 218) pursuant to F.R.C.P. Rules 59(e) and 60(b). Reconsideration in this case is necessary to prevent a grave miscarriage of justice, which could clearly result in the death of an innocent woman: Petitioner's Mother. In its denial of Compassionate Release pursuant to 18 U.S.C. §3582(c)(1)(A), the Court concluded that it had the power to grant relief and that Petitioner's Mother, Charlotte Lisi's suffering qualified as "extraordinary and compelling" circumstances, but the Court felt that Petitioner was not accepting responsibility for his crime because he was appealing the Court's sentence. Respectfully, the Court misapprehends and misconstrues Petitioner's motivations and issues on appeal, and should therefore reconsider its decision and grant Mr. Lisi's Motion for Reduction in Sentence and/or Compassionate Release to Home Confinement or Halfway House as was done in *United States v. Walker*, No. 11-CR-270, (N.D. Ohio Oct. 24, 2019) and *United States v. Bucci*, 409 F.Supp.3d 1 (1st Cir. 2019) in the interests of justice.

## I. PRELIMINARY STATEMENT

With the utmost respect, Petitioner implores the Court to review and reconsider its denial of Petitioner's request for a Reduction in Sentence to reflect the benefit of the April 16, 2013 Plea Agreement that he never saw. All seem to agree that if he had seen it, he would have taken the deal, received a 97 month sentence from Judge Buchwald, and none of these issues and arguments raised by the Government would be relevant or debatable. Simply put, if he had seen the Agreement, these issues like relevant conduct, concurrent sentences, or even acceptance of responsibility would NOT be debated. Though §3582(c)(1)(A) is referred to as "compassionate release", Petitioner's appeal is really just an attempt to reclaim the deal that he should have had with Judge Buchwald for a global settlement of all issues, or a concurrent sentence from this Court as all of the parties, properties, and principals related to the same conduct in all four cases. If the Court believes Judge Buchwald would have given Petitioner a sentence of 97 months, then it should reduce this Court's sentence to 19 months and order Petitioner to serve that time in a Halfway House or in Home Confinement; both of which are still serving a sentence under BOP custody. By doing so, this Court establishes a sentence that is sufficient, but not greater than necessary, to meet the goals of sentencing while giving Petitioner the opportunity to save his Mother's life as he remains under BOP custody.

Contrary to the Government's misguided arguments, Mr. Lisi does not need to serve his new sentence in a Monte Cristo-like Chateau d'If because, according to the BOP's own regulations, being part of the MDC Brooklyn Cadre, in a Halfway House, or under Home Confinement is exactly the same custody level. *See Levine v. Apker*, 455 F.3d 71 (2d Cir. 2006), *citing Goldings v. Winn*, 383 F.3d 17 (1st Cir. 2004). Perhaps the best description of this issue is Judge Ponsor's

decision in *Iacoboni v. United States*, 251 F.Supp.2d 1015 (D. Mass. 2003), which is very instructive of this principle:

> Indeed, the notion of "imprisonment" clearly encompasses conditions of confinement substantially less restrictive than community confinement. For example, §3624(c) authorizes the BOP to "assure that a prisoner serving a *term of imprisonment*" is given the opportunity to serve as much as six months of the final portion *"of the term"* in home confinement. *Id.* (emphasis supplied). In other words, Congress has recognized that an offender may serve a portion of a "term of imprisonment" while living at home, full time. Certainly, there is a substantial difference between the conditions facing an inmate in, say, a maximum security prison and one in a halfway house. The same may be said about the relative situations of an inmate placed in administrative segregation, an inmate at a prison camp, an inmate at a metropolitan detention center, an inmate at a "boot camp" program, or an imprisoned patient at a medical center. But the existence of these differences, however great they may be, does not diminish the character of the confinement to the extent that it is no longer "imprisonment." As the Supreme Court recognized in *Koray*, the critical litmus is whether offenders "always remain subject to the control of the Bureau." *Reno v. Koray*, 515 U.S. 50, 63 (1995). Offenders imprisoned in community confinement are subject to BOP control. They are, as Chief Justice Rehnquist noted, "subject to BOP's disciplinary procedures; they are subject to summary reassignment to any other penal or correctional facility within the system, and, being in the legal custody of BOP, the Bureau has full discretion to control many conditions of their confinement." *Id.* BOP control is the touchstone of "imprisonment," and the BOP exercises complete control over all offenders placed in community corrections. They are imprisoned. Finally, the argument that the BOP, in exercising its Congressionally-bestowed discretion to designate as the "place of the prisoner's imprisonment...any available penal or correctional facility," §3621(b), is, in effect, *failing* to "imprison" the offender when it designates him or her to a community corrections facility simply ignores §3551, which can only be read to include community confinement as a form of imprisonment, the last category of the three "authorized sentences." Thus, as a matter of law, and a matter of common sense, the argument that community confinement is not a form of imprisonment will not wash. *Id.* at 1029.

Therefore, this Court can do the same thing that other judges have done across the country by reducing Mr. Lisi's sentence to whatever level this Court feels adequate, and order him to serve the remainder of his sentence under BOP Custody at the Halfway House in Brooklyn (which is overcrowded), or under Home Confinement, which is the same exact custody level as being in the Cadre at MDC Brooklyn but with the additional benefit that Petitioner can save his mother's life. *See* May 2013 Letter from Blake Davis to All Wardens attached as Exhibit One.

Contrary to the Government's spurious allegations in its Opposition Brief (Gov. Opp.) as to Acceptance of Responsibility, the Government is clearly wrong on that score because Mr. Lisi is only saying that he is entitled to the same "Effective Counsel" that every other American is guaranteed. *See Lafler* v. *Cooper*, 566 U.S. 156 (2012), *Missouri v. Frye*, 566 U.S. 134, 149 (2012), and especially *Lee v. United States*, 137 S.Ct. 1958 (2017), which are all cited in the Second Circuit's recent decision in *United States v. Galanis*, 759 Fed.Appx. 88 (2d Cir. 2019).

*Galanis* is particularly instructive for this Court's review of its decision, because Petitioner's former attorney Lisa Scolari failed to tell the defendant in *Galanis* about a plea agreement in his co-defendant's case, and he ended up getting a much longer sentence than he should have, and a consecutive sentence that he should not have had, all because of Attorney Scolari's errors. *Galanis* provides all that this Court needs to reconsider its decision and amend its judgment to grant relief in sending Mr. Lisi to a Halfway House or Home Confinement, both of which are still under the custody of the BOP. Moreover, not only does Mr. Lisi have the lowest PATTERN Score at MDC Brooklyn because of all of his classes (both taken and taught), he is Community Custody and has a Zero Points Custody Level Score with a Negative Four Variance. As this Court has already decided that Mr. Lisi is not a danger to the community, the Court should take comfort that he has had a spotless record in prison with no Infractions, and the Court can review all of his prison accomplishments in the package he sent to the Court. (See Dkt. 217).

Therefore, since the Court believes it has the power to reduce Mr. Lisi's sentence under the First Step Act, and his Mother's situation constitutes "extraordinary and compelling" circumstances, Petitioner respectfully asks this Court to reconsider the §3553(a) factors and reduce his sentence to whatever amount of time the Court deems fair and in the interests of justice under the BOP's custody for the reasons detailed below. In that way, the Court can send its message of

general deterrence by keeping Petitioner under BOP Custody in either a Halfway House or Home Confinement, while at the same time helping to save Charlotte Lisi's life. Please see the Declaration of Daniel Carpenter in Support of this Motion for Reconsideration attached as Exhibit Two.

## II.   LEGAL STANDARD

Fed. Rul. Civ. P. 59(e) permits a party to move to alter or amend a judgment within 28 days from the entry of the judgment. Although the Rule does not specify what grounds justify an amendment or reconsideration of a judgment pursuant to F.R.C.P. 60(b), both Rule 59(e) and Rule 60(b) are inherently equitable in nature and provide the Court with great latitude to change its mind in the interests of justice and to prevent a manifest injustice. A court may "reconsider an earlier decision when it is confronted with an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *See United States v. Becker*, 502 F .3d 122, 127 (2d Cir. 2007), *quoting United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000). Subsection (b)(6)—the catch-all provision of Rule 60(b)—"allows courts to vacate judgments whenever necessary to accomplish justice...." *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009) (*citing Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847, 863 (1988).

A motion for reconsideration also serves a valuable function, where the Court "has patently misunderstood a party or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning, but of apprehension." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269-70 (7th Cir. 1996). Moreover, most courts have long recognized the "inherent equitable powers of courts of law over their own process, to prevent abuses, oppression, and injustices." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 (1984). It seems beyond peradventure that those inherent powers of the court must include a judge's

power to correct his own decisions when they are clearly based on the government's misrepresentation of the law and/or the facts of any given situation as was done in this case.

Respectfully, all of these issues are readily apparent in the Court's denial of Mr. Lisi's Motion for a Reduction in Sentence and/or Compassionate Release pursuant to §3582(c)(1)(A), (Dkt. 218), and therefore this Court should exercise its discretion to reconsider its February 24, 2020 Order and grant the relief requested pursuant to §3582(c)(1)(A).

## III. ARGUMENT

### A. The Court Misapprehends Mr. Lisi's Appeal

Despite the Government's arguments to the contrary, Petitioner's Appeal is very straightforward and at no time alleges his innocence or contradicts his acceptance of responsibility. Far from it, the Supreme Court cases that Petitioner relies on for asserting his Ineffective Assistance of Counsel claims: *Lafler, Frye*, and *Lee*, are the very same cases that led the Second Circuit to vacate the defendant's sentence in *Galanis* and remand it back to the district court so Galanis could get the benefit of the deal he never saw, due to the ineffectiveness of Petitioner's attorney in this case, Lisa Scolari. Similarly, Petitioner's argument that he should have had a concurrent sentence because the post-arrest conduct is clearly related pursuant to U.S.S.G. §5G1.3(b) is not just substantiated, it is a meritorious argument that this Court should reconsider because not only is the "post-arrest" conduct clearly related, it is the exact same conduct that was covered by the global April 16, 2013 Plea Agreement that Petitioner never saw until Attorney Scolari sent it to him after he had already pleaded guilty in this case.

What more does this Court need for a *Lafler-Frye-Lee* analysis? Attorney Scolari had a much better plea agreement in her possession (or how could she send it to Ft. Dix?), she never discussed it with Petitioner (which is Ineffective Assistance of Counsel by any standard), much

less did any of the required analysis of the Plea Agreement that the Supreme Court says is required for counsel to be "Effective". This resulted in "prejudice" to Petitioner ("any amount of actual jail time is significant for Sixth Amendment purposes," *Glover v. United States,* 531 U.S. 198, 203 (2001)), so both prongs of *Strickland v. Washington,* 466 U.S. 668 (1984) are satisfied here. In *Lee*, no one ever contested Lee's acceptance of responsibility, and his conviction was vacated by the Supreme Court. Unlike the defendant in *Lee* who was caught red-handed with the drugs but was still able to negotiate an excellent year-and-a-day sentence, and still appeal to the Supreme Court to vacate his conviction and sentence, Petitioner is repeatedly subjected to unwarranted criticism by the Government quoting Judge Buchwald comments from eight years ago. Petitioner's Mother had a stroke in 2012, and her health has declined markedly since then. But, the Government, instead of agreeing that Petitioner had the worst attorneys on record including Randy Zelin and Scolari (*Galanis*), continues to say that Petitioner is not "contrite" enough and has not "accepted" responsibility, despite his guilty pleas in not one case (like in *Lee*), but four separate cases that should have been covered by the Global Plea Agreement of April 16, 2013 that neither attorneys Zelin nor Scolari showed or advised him of.

This is Ineffective Assistance of Counsel by any standard according to the Supreme Court in *Lee* and the Second Circuit in *Galanis*. Therefore, Petitioner should not be "prejudiced" a second time by having the Government object to his "compassionate" release to Home Confinement pursuant to §3582(c)(1)(A) and the First Step Act simply because he is appealing on the basis of Ineffective Assistance of Counsel, as do 10,000 other defendants year after year who pleaded guilty without question of their acceptance of responsibility; which is also not one of the relevant factors that should be considered in an §3553(a) analysis for the purposes of §3582(c)(1)(A). *See, e.g.,*

*United States v. Cantu,* 2019 WL 2498923 at *1 (S.D. Tex. June 17, 2019), and *United States v. Bucci,* 409 F.Supp.3d 1 (1st Cir. 2019).

**B. The Court Should Reconsider Its Decision**

Petitioner respectfully requests the Court to review the opinion in *Cobb v. United States,* 2019 WL 2607002 (E.D.N.Y. 2019). In *Cobb,* Judge Allyne Ross admits she made a mistake in her review of the defendant's letter to the Court, and that she misconstrued his arguments about related conduct under §5G1.3(b), and admits that she should have reduced Cobb's sentence. The defendant in *Cobb* also suffered from Ineffective Assistance of Counsel, but unlike Petitioner, he did submit a 2255 Petition which Judge Ross denied but then reconsidered, admitted her mistake, and granted Cobb's Petition to reduce his sentence. Judge Ross provides not just a scholarly analysis of the law on motions for reconsideration and how to construe a Petitioner's *pro se* filings in quoting *Green v. United States,* 266 F 3d 78, 83 (2d Cir. 2001) and concluding that: "Construing Mr. Cobb's 2255 Petition liberally, he sufficiently raised the issue that his trial counsel was ineffective for failing to preserve and argue on appeal my §5G1.3(b) error." *Cobb* at *2.

Like Petitioner, Cobb wrote several letters to Judge Ross which she discusses in her opinion. To her credit, Judge Ross has written a masterful opinion in Cobb that should be cited by *pro se* litigants everywhere as well as to be the model every judge should follow in tempering Justice with Mercy. "In deciding what sentence will be sufficient, but not greater than necessary to further the goals of punishment, a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh,* 877 F.3d 107, 121 (2d Cir. 2017). Petitioner respectfully asks this Court to reflect on Cobb while reconsidering Petitioner's Motion.

### C. Petitioner Merely Seeks Halfway House and/or Home Confinement as well as a Fair Sentence

In his October letter to the Warden, Mr. Lisi made it clear that if he was unsuccessful in saving his Mother's life, he would **return to prison**. He also sent numerous letters to the Court asking for Home Confinement to help his Mother with the same caveat he promised the Warden. More importantly, according to the Second Circuit in *Levine v. Apker*, 455 F.3d 71 (2d Cir. 2006) *citing Goldings v. Winn*, 383 F.3d 17 (1st Cir. 2004), there is no difference in "Custody Level" between Petitioner serving his 38 month sentence in a Camp, a Halfway House, or under the BOP's custody in Home Confinement as Blake Davis made clear in his May 2013 Memo to all Wardens, and as Director Kathleen Hawk Sawyer made clear in 1998 and 1999 in BOP Program Statement 5321.08 (A CCC [Halfway House] meets the definition of a penal or correctional facility pursuant to 18 U.S.C. §3621(b)).

When someone is in a Halfway House or Home Confinement, they are still in BOP Custody. In fact, the November 2016 OIG Report criticized the BOP for not utilizing the Home Confinement option more, as there is no difference from a custody standpoint between a Camp, a Halfway House, or Home Confinement. The individual is still "imprisoned" under the BOP's Custody. Also, pursuant to the First Step Act and the new §3624(g)(10), there is now no limit to the length of time that an individual can serve on Home Confinement or in a Halfway House. If this Court reduced Petitioner's sentence to 19 months pursuant to the April 16, 2013 Plea Agreement that he never saw, and allowed him to take care of his Mother, that would be fair and equitable for all involved. But, instead, the Government continues to disparage Petitioner with false claims rather than addressing the Ineffective Assistance of Counsel claims and mistakes made by Petitioner's various attorneys throughout this entire prosecution. Petitioner has even offered to come back to prison. See Exhibit A, Part 3 (pg.3) of Dkt. 217.

Petitioner never required time served, he only wanted the benefit of the bargain that he was never shown, i.e. the April 16, 2013 Plea Agreement. Alternatively, he merely requested a credit of 18 months for the time he served on strict house arrest because he was never given a bail hearing (bail modification hearing). (See 12/12/12 Tr. of appearance before Judge Buchwald and Judge Swain, wherein the bail hearing was adjourned but no follow up hearing was ever conducted). The point being that Petitioner was simply asking of this Court for his sentence to be reduced to reflect the April 16, 2013 Plea Agreement and the Sentencing Guidelines (Reduction In Sentence), in order that he be given some relief out of compassion to get him home sooner to his Mother, and NOT "time served," but instead that he be sentenced to a sentence of no more than 19 months "consecutive" to Judge Buchwald's sentence (if not given a "concurrent" sentence) as a Reduction in Sentence from Your Honor's sentence of 38 months. Moreover, Petitioner has offered to come back to jail if he fails to save his Mother's life. He prays to go home and take care of his Mother, and not to live life as a free man under time served.

### D. Petitioner's Record While Incarcerated has been Exemplary

The Government, in its Opposition Brief to Petitioner's Appeal, concedes (and is therefore estopped from arguing now) that this Court found he had accepted responsibility and had done good things in prison to rehabilitate himself. *See, e.g.*, Gov. Opp. at page 23: "Judge Failla went on to discuss the good Mr. Lisi has done and in particular took note of his exemplary conduct while in prison, his efforts at rehabilitation, and his care for his mother. (A.280)." Therefore, these facts are now clearly subject to the Law of the Case Doctrine, and the Government is therefore estopped from arguing against and should not be allowed to contradict this Court's clear findings to the contrary from September 2017, now almost three years later; especially in light of the Government's waiver and agreement that Mr. Lisi had accepted responsibility and had done good

things with his time in prison. (See Govt. Opp. Br. on Appeal 17-3185 at p. 23). Had Petitioner received a concurrent sentence in September 2017, and been allowed to be at a Camp with RDAP, all parties can agree that he would be home right now helping his Mother in the wake of the Coronavirus rather than debating old and decided issues with the Government.

Moreover, even a cursory glance by the Court at Petitioner's record in prison would show that he has participated in thousands of hours of BOP sponsored programs. Not only has Petitioner taken BOP courses, he has taught them as well. At Fort Dix, he was the Law Librarian Clerk. Significantly, Mr. Lisi was also allowed to create a curriculum of classes with Mercer Community College that would have allowed inmates to earn college credits while in prison. In the Exhibits included with the Declaration in Dkt. 217 there are numerous distinctions. But, unlike other successful compassionate release candidates (*e.g. Cantu, Bucci,* and *Walker*), Petitioner has an unblemished and spotless record in prison which should inure to his benefit in the §3553(a) calculation. At Petitioner's original sentencing, this Court spoke well of his many good deeds while in prison, and that point should not be lost: that he used his "in prison" time wisely to benefit others, as was described by the judges who granted relief in *Walker* and *Cantu*.

### E.  The Widow Lisi Deserves this Court's Compassion, Help, and Protection

In this Court's denial of Petitioner's Motion for a Reduction in Sentence and Compassionate Release, it focuses on one of the victims in this case being a Widow. But Petitioner's mother, Charlotte Lisi, is also a widow and victim of fraud. In fact, the $250,000 that Mrs. Lisi set aside for herself from the proceeds of a reverse mortgage that she took against the home she currently lives in so that she would and could be taken care of while her son was in prison, was stolen by Richard Bivona, a witness against Petitioner in this case ***and*** the fraudster Alex Kopolous, who was used as a government witness and is listed as a "victim" in Petitioner's Restitution Schedule.

So, in a very "Orwellian" context, some widows appear to be "more equal" than others. The Widow in this case has been paid back her $500,000, but the facts are indisputable. Petitioner never represented the Widow; a friend of attorneys Randy Zelin and Eric Naiberg by the name of Alex Constantopes did; and they all told their client, the Widow, that it was perfectly fine to put her $500,000 into a project where some of the funds ($150,000) would be used to pay Attorneys Zelin and Naiberg to represent Petitioner in his defense in this case. Petitioner never received a dime of the Widow's money. This is not just a classic "conflict of interest" which is *per se* Ineffective Assistance of Counsel. If anyone defrauded the Widow, it was Zelin and Naiberg; not Petitioner.

Unfortunately for the Widow Lisi, the same government that pounds the table for justice for the Widow in this case (who has been paid back the full $500,000) and continually castigates and defames Petitioner, has done nothing to bring Alex Kopolous to justice for defrauding the Widow Lisi of literally her life savings and has actually been protecting this rogue from prosecution. Therefore, unlike the Widow in this case that has received all of her money back and is living comfortably in a warm house, the Widow Lisi is starving and living without heat in a condemned home, filled with Black Mold, that is being foreclosed upon because the Government does not wish to prosecute Alex Kopolous for the outright fraud and theft of the Widow Lisi's $250,000. This Court should therefore respectfully temper its justice for one widow, by showing mercy to the son of another widow.

## CONCLUSION

For the reasons stated above, Petitioner respectfully requests this Court grant his Motion for Reconsideration, reduce his sentence, and grant him Halfway House and/or Home Confinement to serve the remainder of his sentence so that he may care for his ailing Mother.

Dated: March 12, 2020

Respectfully Submitted,

/s/ Brandon Lisi
Brandon Lisi
Petitioner, Pro se
Incarcerated Inmate
Reg. No. 62739-054
MDC Brooklyn
P.O. Box 329002
Brooklyn, NY 11232

# EXHIBIT
# ONE

May 24, 2013 Letter from Blake Davis to All Wardens



U.S. Department of Justice

Federal Bureau of Prisons

Washington, D.C. 20534

**MAY 24 2013**

MEMORANDUM FOR REGIONAL DIRECTORS
       WARDENS
       RESIDENTIAL REENTRY MANAGERS

FROM:   Blake R. Davis, Assistant Director
      Correctional Programs Division

SUBJECT:  Guidance for Home Confinement and Residential
      Reentry Center Placements

This memorandum is a compilation of previous guidance memoranda, policy, and practices regarding home confinement and Residential Reentry Center (RRC) placement decisions, as they relate to current policy, practice, and changes which were necessitated by the passage of the Second Chance Act of 2007. The intent of this memorandum is to reemphasize and clarify established policies and practices to facilitate effective community placements.

## I. GUIDING PRINCIPLES FOR EFFECTIVE COMMUNITY PLACEMENTS

The Bureau's RRC resources continue to be limited and must be focused on those inmates with the greatest need and the highest risk of recidivism. Program Statement 7310.04, <u>Community Corrections Center Utilization and Transfer Procedures</u>, requires that RRC placements be made based on assessments of inmate needs for services, public safety, and the necessity of the Bureau to manage its inmate population responsibly. The Second Chance Act emphasizes the requirement that all inmates are eligible for pre-release RRC placement consideration and are to be assessed on an individual basis.

An individual inmate assessment is the primary means by which we determine an inmate's need and risk level. Research indicates that inmates with low needs and a low risk of recidivating who are placed in an RRC do not benefit from the placement and could become more likely to recidivate than if they received no placement.

In accordance with the Bureau's mission to ensure public safety, each inmate must be thoroughly evaluated based upon their need for reentry services, as well as perceived risk for recidivism and risk to the community. This was previously outlined in the June 24, 2010, memorandum "Revised Guidance for Residential Reentry Center Placements," and the April 14, 2008, memorandum "Pre-Release Residential Reentry Center Placements following the Second Chance Act of 2007."[1] When contemplating an inmate's appropriateness for community placement, staff should continue to follow current policy and practice and consider public safety while determining an inmate's need for reentry services. This will help determine whether or not receiving reentry services might mitigate those public safety concerns in the long run. For example, some higher risk inmates may initially appear to be inappropriate for referral to an RRC. However, when you thoroughly weigh the potential for increased risk of recidivism of a street release versus release through an RRC, it may in fact be in the best interest of public safety to refer the inmate to the RRC.

Accordingly, every effort should be made to consider community placements for inmates with manageable medical and mental health needs. These placements can help mitigate the potential increased recidivism risk of sending an inmate with these needs directly to the community. A community placement provides more expedient access to resources to address the specialized needs of these populations. Staff must take the steps necessary to facilitate these placements.

For low need/low risk inmates, home confinement is the preferred pre-release option. This option is currently under-utilized. Program Statement 7320.01, Home Confinement, states supervision under home confinement may be provided by contract halfway house services, U.S. Probation or other government agencies.

---

1 See Sallyport, Correctional Programs Division, Correctional Programs Branch, CPB Topics "RRC"

This is normally accomplished via two home confinement options - placement under the supervision of an RRC or placement in the Federal Location Monitoring (FLM) program operated by U.S. Probation, where available. We must make a concerted effort to utilize these effective community placement options for appropriate inmates. In addition to reintegrating inmates more quickly into their communities, maximizing the use of home confinement for appropriate inmates will help mitigate our critical population/capacity issues.

Residential Drug Abuse Program (RDAP) graduates who successfully complete the institution-based portion of the RDAP will continue to be assessed for pre-release RRC placements according to the guidance in P7430.02, Community Transitional Drug Abuse Treatment.

Wardens and Residential Reentry Managers (RRMs) play a vital role in ensuring an effective assessment process for inmates' community placements. This memorandum highlights the major elements of an effective RRC and home confinement utilization strategy.

## II. MAKING AN APPROPRIATE RRC REFERRAL

As clarified in the June 2010 memoranda noted above, the Second Chance Act states that while all inmates are statutorily eligible for pre-release community placement, not all will be appropriate. Inmates must continue to be individually assessed for their appropriateness for and the length of pre-release RRC placements using the following five factors from 18 U.S.C. § 3621(b) and outlined in the April 2008 and June 2010 memoranda:

(1) The resources of the facility contemplated;
(2) The nature and circumstances of the offense;
(3) The history and characteristics of the prisoner;
(4) Any statement by the court that imposed the sentence:
    (a) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
    (b) recommending a type of penal or correctional facility as appropriate, and
(5) Any pertinent policy statement issued by the U.S. Sentencing Commission.

When reviewing the above factors, staff should continue to consider the inmate's need for reentry services, public safety

concerns, and the need to responsibly manage the Bureau's inmate population.

Staff should also continue to thoroughly assess inmates' individual reentry needs when considering the appropriate duration of an RRC placement as outlined in the above referenced memoranda, current policy, and practice. A placement less than 90 days is typically not considered sufficient to address multiple reentry needs. In many cases, a placement of several months up to the maximum of one year[2] may be needed to accomplish an inmate's reentry goals. For example, an inmate with no recent employment, no GED, and poor family ties would benefit more from a one year placement than an inmate who has a short sentence, employment prospects, a high school diploma, and frequent family contacts. The number of placement days should be driven primarily by the inmate's needs and risk level (as determined by the BP-338 Custody Classification assessment or BP-337 Security Designation assessment if a BP-338 has not been completed).

The BP-338 is the Bureau's primary risk prediction instrument. Ordinarily, the lower the BP-338 score, the lower the inmate's risk; conversely, the higher the score, the higher the inmate's risk. Those with lower risks should be considered for home confinement placement and those with higher risks should be considered for RRC placement.

It is important to note that in many areas, the Bureau continues to have contracting options available to utilize the more secure environment of a Work Release Center (e.g., county jail/detention center) as a community placement. This may be the most appropriate placement option for inmates who may require closer supervision than an RRC. Institution staff should contact the applicable RRM to determine if this option is available in the area where the inmate is releasing for cases that may be deemed inappropriate for a traditional RRC.

If an inmate is truly not suitable for transfer to an RRC prior to release, staff have the option of contacting the USPO to discuss a possible public law placement wherein the judge places the individual in an RRC after their release from Bureau custody as a condition of supervised release.

---

2 See Title 18 U.S.C. § 3624(c)(1).

## III. MAKING AN APPROPRIATE REFERRAL FOR DIRECT HOME CONFINEMENT (PRE-RELEASE)

As outlined in P7320.01, Home Confinement, and per 18 U.S.C. § 3624(c)(1), all inmates are eligible for home confinement consideration at their six-month or 10 percent date. When considering an inmate for pre-release community placement, the unit team should pay special attention to reviewing low and minimum security inmates for possible direct placement on home confinement as allowed under P7320.01, Home Confinement. Higher security inmates may be considered if deemed appropriate following an individual assessment. The basic criteria for home confinement includes:

1) Appropriate release residence (e.g., positive environment free from criminal/drug use activity and a reasonable distance from the RRC, typically less than 100 miles);
2) No recent major disciplinary issues. This should be based on sound correctional judgment;
3) Any medical or mental health needs that can be met in the community and funded by the inmate or other documented resources, and
4) Secured employment is not required for placement on home confinement.

Placement should occur as close to the home confinement eligibility date as possible. The direct home confinement referral is not contingent upon USPO residence approval. A site visit should be requested during the referral process, but should not delay the submission of the referral to the RRM.

As part of their routine duties in processing inmate referrals, RRM staff will determine if placement will be via an RRC contract or FLM. In judicial districts where FLM is available, RRM staff should consider this option for appropriate inmates to the maximum extent possible.

## IV. RRM STAFF REVIEW OF RRC/HOME CONFINEMENT REFERRALS

RRM staff will continue to thoroughly review referral documents and other pertinent information for each community placement referral. RRM staff are encouraged to maximize resources to include recommending direct placement on home confinement for appropriate inmates.

The RRM is required to review home confinement eligible inmates in RRCs every two weeks and follow-up with RRC contractors within three working days (of receipt of the biweekly status report) to ensure RRC staff have (as part of the individualized program plan for the inmate) documented an appropriate plan of action with target dates to achieve home confinement placement. This follow-up time frame is a slight reduction from the June 2010 memorandum referenced above which required a weekly review. In locations where RRC bed space is limited, ensuring an inmate's timely placement on home confinement will help address capacity issues and also ensure more inmates are afforded RRC services. This area will be carefully reviewed for compliance during operational reviews and program reviews.

As previously indicated in the June 2010 memorandum, RRM staff will not unilaterally deny RRC referrals or reduce placement dates unless there are no available RRC beds within a reasonable distance for the specific referral date/length.

## V. COORDINATION BETWEEN INSTITUTION STAFF AND RRM/CTS STAFF

As the subject matter experts for their assigned location, RRM and Community Treatment Services (CTS) staff assist institution staff in making community placements. They provide information regarding available resources and discuss specific cases with institution staff as needed during the referral process and prior to the inmate's transfer to the RRC or placement on direct home confinement. It is important for institution and RRM staff to collaborate with CTS staff to ensure inmates with drug, mental health, or sex offender treatment needs have community-based treatment available in the vicinity of the placement.

If RRM staff have concerns regarding a referral and/or the recommended placement, they will communicate these concerns to the referring institution, typically the Case Management Coordinator (CMC).

If the RRM determines a modification to a referral is needed or that other placement options are available (such as direct home confinement for an inmate with low needs/risk or placement in a work release program for a higher security inmate), the change must be approved by the Warden. The RRM will contact the referring institution's CMC and request the recommended modification be considered. The CMC will facilitate the

Warden's review of the request and advise the RRM accordingly. Modifications can occur with the Warden's consent.

Conflicts regarding modifications to referrals should be addressed by institution management staff with the applicable Regional RRM Administrator. (Note: RRM Sector Administrators will assume this responsibility once the nationwide consolidation of RRM is completed. Contact information will be disseminated to institutions accordingly.)

If institution staff determine an inmate is not appropriate for RRC placement, the inmate's release should be carefully coordinated with U.S. Probation or Court Services and Offender Supervision Agency (for DC Code inmates). Such efforts should include the transmission of pertinent mental health and medical information and any other factors that could impact the effective reentry of the inmate to the supervising authority.

## VI. SUMMARY

- Community placements should be driven by the results of an inmate's individual assessment.
- RRC placement and length of placement decisions cannot be reduced solely to a classification score or any other type of objective categorization. While staff assessment and analysis of the Custody Classification Form (BP-338) and the ISD Plan are helpful in establishing broad-based groupings, staff must continue to exercise their professional judgment when making individual inmate RRC placement decisions and be prepared to justify those decisions. When making RRC placement decisions, staff should ensure the BP-338 and ISD Assessment have been completed accurately.
- All inmates are eligible for home confinement. Direct placement on home confinement should be considered for low and minimum security inmates. In judicial districts where FLM is available, RRM staff should consider this option for appropriate inmates to the maximum extent possible.
- RRMs will continue to be required to review home confinement eligible inmates in RRCs on a regular basis as set forth above. In locations where RRC bed space is limited, ensuring an inmate's timely placement on home confinement will help address capacity issues and also ensure more inmates are afforded RRC services.

- Every effort should be made to consider community placements for inmates with manageable medical and mental health needs. A community placement provides more expedient access to resources to address the specialized needs of these populations. Staff must take the steps necessary to facilitate these placements.

Your assistance in maximizing the RRC/home confinement utilization process is greatly appreciated. If you have any questions, please do not hesitate to contact me or have your staff contact Brent Kiser, RRM Administrator, at 202-305-8906.

# EXHIBIT
# TWO

Declaration of Daniel Carpenter in Support
of Petitioner's Motion for Reconsideration

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>BRANDON LISI, )<br>       Defendant )<br>) | CASE NO. 15-CR-457 (KPF) |

**DECLARATION OF DANIEL CARPENTER IN SUPPORT OF PETITIONER
BRANDON LISI'S MOTION FOR RECONSIDERATION**

I, Daniel Carpenter, make this Declaration pursuant to 28 U.S.C. §1746 and state as follows under oath:

1.  My name is Daniel Carpenter and I am currently an inmate at MDC Brooklyn.

2.  I am submitting this Declaration in support of the Petitioner, Brandon Lisi's new Motion for Reconsideration asking this Court to reconsider its denial of his motion for a Reduction in Sentence and/or Compassionate Release.

3.  I am the author of Brandon's Motion for a Reduction in Sentence and/or Compassionate Release pursuant to 18 U.S.C. §3582(c)(1)(A). I am solely responsible for the language that the Court takes exception to in its denial of Brandon's Motion. See, e.g., Page 13 of Dkt. 218, the Court's decision. I also believe that Brandon is innocent of the crimes charged in the Indictment, and that he is the victim of both egregious prosecutorial misconduct and Ineffective Assistance of Counsel. But, for the purposes of this Motion, I also believe that I have significant knowledge of the facts of this case that the Court needs to hear in order to make an informed decision in the interests of justice. I can categorically state for the record that Brandon has accepted responsibility for his actions, and he is indeed contrite and not "crying Wolf" or using his Mother's dire

condition to garner the sympathies of the Court. That said, he is entitled to Effective Counsel like every other American, and he did not receive that. Nor did he receive a fair or appropriate sentence pursuant to the April 16, 2013 Plea Agreement that I can guarantee to the Court he never saw until it was too late, and he had already pleaded guilty. In his Motion, he is not asking to get his plea back or proclaiming his innocence, but rather he begs this Court for a reduced sentence based on the April 16, 2013 Plea Agreement and to serve that sentence under BOP Custody on Home Confinement or in the Brooklyn Halfway House, rather than in a Maximum Security prison like MDC Brooklyn. This Court clearly has the power to grant the relief that Brandon seeks, and therefore as the author of the Motion, I respectfully beg this Court to temper its justice with mercy and to reduce Brandon's sentence to some amount of time on Home Confinement, which is exactly the same custody level as being in the Cadre here at MDC, but with the added advantage that he can save his Mother's life.

4. I first met Brandon at the Camp of USP Canaan in June 2014. I also met his girlfriend Katerina Arvanatakis at that time because she would come to visit him at Canaan.

5. Often on visiting days, my wife and I would sit next to them or close to them, so it was not difficult to overhear other inmate's conversations. In fact, it was impossible not to.

6. I mention this to the Court because I never saw Brandon so much as even raise his voice to Katerina. To the contrary, he always referred to her as his "Greek Girl" because my Bunkie at Canaan was truly Greek and could converse with her in Greek. There was no doubt in my mind that Brandon and Katerina were a loving and affectionate couple. The allegations made by Katerina's attorney at her sentencing are not just false, they are defamatory as far as I am concerned.

7. The reason I need to raise this issue before the Court is that I am the author of Brandon's Motion for a Reduction in Sentence and Compassionate Release so he can help his Mother. I am literally responsible for every single word in Brandon's brief, so if the Court or the Government has a problem with the tone of the brief, it is solely my fault and not Brandon's.

8. I am familiar with the facts of this case because Brandon and I talked extensively about his case with Judge Buchwald at Canaan. Because I was blessed to have excellent attorneys who had helped me in the past, I arranged to have such distinguished attorneys as Alan Dershowitz and Marc Fernich review his case. They agreed with my analysis that Brandon was innocent of any crime and that he never should have pleaded guilty. If the Court feels that Brandon is not contrite or refusing to "accept" responsibility, that is because of my beliefs expressed in the Motion, not Brandon's.

9. Filing the Motion for a Reduction in Sentence/Compassionate Release was all my idea to help Brandon get back to his Mom. I also helped Brandon with his appeal to the Second Circuit. I am also the author of Brandon's Motion for Reconsideration.

10. This will probably come as a surprise to the Government because they know that Brandon helped dozens of inmates at Fort Dix (where he was legendary in helping everyone around him, especially the illiterate); he is truly a kind soul seeking forgiveness. The staff here have even come to Brandon to ask questions about the implementation of the First Step Act. Brandon has worked with numerous inmates here to get them out early as Elderly Offenders. He helps the elderly and literally donates all of his time to helping others.

11. So why would Brandon use me to draft his §3582(c)(1)(A) Motion for a Reduction in Sentence? The answer is very simple: No one in the country has done as many §3582(c)(2) Motions for a Reduction in Sentence as I have. When I was at Canaan, Brandon knew that I helped dozens of inmates with gun and drug charges to do motions pursuant to §3582(c)(2) because of Amendment 782 to the Sentencing Guidelines. Of the inmates I helped, most of them received a reduction in sentence or a generous increase in Halfway House time. The smallest reduction was 10 months, and up to 4 years of sentence reduction with 11 months of Halfway House time for someone who had served 8 years of a 15 year sentence. He hugged me in front of all the inmates as he was walking out the door. Brandon saw many of these success stories before he was sent to the SHU and Fort Dix because of the Indictment in this case.

12. Brandon met Attorney Marc Fernich because of me, and Marc Fernich came to Canaan to meet with Brandon at no charge to review his case because my attorney in Boston, Marty Weinberg, asked him to do that as a favor for a friend of Dan's.

13. Marty had been working on a famous case in New York with Marc Fernich, and I had email correspondence with Marty this very week asking him to help a friend of mine at Fort Devens with his motion for compassionate release since I am not there any longer. As I am sure that the Government is interfering with my mail as well as Brandon's, it should be no problem to check out the accuracy of my statement on Corrlinks.

14. I was introduced to Marty Weinberg by my first attorney in Boston, Professor Alan Dershowitz. The funny story was that Alan had to renew his law license to take my case, and when he came to argue my motion to dismiss in front of Judge O'Toole in

Boston (famous for the Boston Bomber case), it was standing room only. Every clerk and most of the attorneys in the Moakley Courthouse were there to hear Alan's arguments in my defense. When Judge O'Toole denied my motion to dismiss, Alan introduced me to Marty Weinberg to handle my defense. Judge O'Toole granted Rule 33 Motions twice after my trials in 2005 and 2008 which the Government appealed. Despite having served my sentence in the Boston case, I am still on appeal in the First Circuit. Before I reported to Canaan in June of 2014, I was indicted by the Government in a totally unrelated case in May of 2014, and my attorneys in that case are Michael Levy and Jim Cole of Sidley. Mike was the former head of the Government Appellate Unit for the Second Circuit and Jim was the former Deputy Attorney General. Brandon heard from my wife that Alan told her that "Dan has done more 2255's than any attorney I know, including me."

15. I say this as a backdrop because when I arrived at the Cadre Unit of MDC Brooklyn, it was late at night in early December, and I was greeted by several Canaan alumni including Brandon. For 3 hours that night he told me about his case. At that time, I decided that I would help Brandon and investigate the facts of the case myself as an objective observer. After reading the various filings that Brandon had in his possession (many other documents are missing or still in storage and inaccessible to Brandon despite this Court's orders to the contrary), I came to the conclusion that he was innocent and lacked the necessary criminal intent, but was in fact the victim of egregious Ineffective Assistance of Counsel; not just from Attorney Zelin, but Attorney Lisa Scolari as well.

16.     I also decided to help Brandon because he is destitute. Any money he receives goes to phone calls to his Mother or to ask other people outside to help his Mother or to check in and see how she is doing. MDC Brooklyn is not a camp. It is truly a Maximum Security Prison where we are locked down every other week because of some fight or emergency on another floor. And if there was a problem that caused a lockdown on this floor, the Emergency Buzzers do not work in our cells.

17.     Moreover, whereas I have been blessed with a loving wife and with some of the best attorneys in the country, Brandon is a true "basket case" between his lack of funds, limited resources, and concern for his Mother; he has no one on the outside to help him with his case or look after him. And, after I read the Government's attacks on Brandon's character and Katerina's attorney's malicious attacks on Brandon, I wanted to set the record straight and tell this Court about the Brandon I know.

18.     I also have a couple of young guys on the outside that can help me with research, typing and filing of motions. Not only is the Law Computer here hopelessly behind the times for doing research, the one printer here is always out of paper or toner or doesn't work for some reason. There is no way to copy anything either. My young guys can type and file things for people here as a favor to me.

19.     Brandon's attention is not on his legal arguments, but on his Mother's health and all the problems she has had lately. We have literally had arguments where I have wanted to play the role of Sidney Powell (Licensed to Lie) and go after the Government for its egregious prosecutorial misconduct in this case, whereas Brandon wants to tone things down because he lives in fear of Special Agent Smythe, the prosecutors, and even incurring the wrath of this Court as he clearly experienced with Judge Buchwald.

20. Just so the Court knows, I will probably be helping Brandon with his 2255 in the Buchwald case as well, because I was the one that encouraged him to try to get his guilty plea back and argue about Attorney Zelin's ineffectiveness in that case. I apologize to the Court if my tone in the filings was too strident, but I have been fighting the Government in my own case since 2001, and I continue to fight in the First Circuit as well as the Second. Unlike me, Brandon has neither the will nor the means to fight. Not only is Brandon "contrite" and accepting responsibility, he is ultimately a broken man that has a spotless record in prison not just because he cares about his Mother, but because he spends all of his time helping other people without accepting so much as a tuna or a mackerel in payment.

21. I can personally attest to the Court that Brandon is both contrite and accepting of responsibility. He is also more rehabilitated than the defendant in *Pepper v. United States*, 562 U.S. 476 (2011), and the BOP should use him as their poster child for rehabilitation.

22. Contrary to the Government's malicious slanders, in his appeal Brandon seeks only to have the benefit of the April 16, 2013 Plea Agreement, which I can promise the Court he never saw, which is why I argue that what Attorney Lisa Scolari failed to do is *per se* Ineffectiveness of Counsel. I also believe that if the "Loss Mitigation Strategy" was what the illegality in this case involving post-arrest conduct, then that was all Attorney Zelin's fault. But, now that the Court knows that the selling of the historic Sag Harbor property, 6 Union Street, would have made everyone whole with no victims, I feel this Court has a duty to do justice and reduce Brandon's sentence and place him on Home Confinement to help his Mother. For the Government and Katerina's attorney to make

Brandon out to be a monster, rather than point out the picture of 6 Union Street Sag Harbor in the Mansion Section of the Wall Street Journal, is beneath the dignity of an officer of this Court. The picture provided to the Court is from my Wall Street Journal. I saw the ad and asked Brandon if this was the famous "Sag Harbor property" referred to in all the filings of this case.

23. I know the Court believes that Judge Buchwald would have set the sentence higher than 78 months based on the Global Settlement of the April 16, 2013 Plea Agreement. I respectfully disagree for a number of reasons. But, respectfully, because we are discussing the Plea Agreement that covers the same people, parties, principals, and properties, this means they are all related conduct and this Court's sentence should have been concurrent and not consecutive. Once again, my point is that Brandon should have had an Attorney secure an 11(c)(1)(C) agreement that would have been binding on this Court. Once again, that was malpractice and ineffectiveness on Attorney Scolari's part. Brandon has said that he did not even know about 11(c)(1)(C) until I told him about it in December of 2019.

24. But assuming the Court is correct that Judge Buchwald would have given Brandon the top end of the 78-97 month range, the April 16, 2013 Plea Agreement would have effectively limited the sentence of this Court to another 19 months. Brandon was merely stating the obvious in his appeal that he should have had the benefit of that April 16, 2013 Plea Agreement to limit this Court to 19 months, if not a concurrent sentence, pursuant to *Lafler, Frye,* and *Lee.* In fact, the Second Circuit's decision in *Galanis* which I found is directly on point.

25.   To show how contrite Brandon really is, the Court need only look at page 3 of his October 16, 2019 letter to the Warden where he says he will gladly return to prison if he is unsuccessful in saving his Mother's life. These are not the words of an unrepentant, non-contrite person who refuses to accept responsibility. Far from it, he is the epitome of a contrite person that cares more for his Mother's well-being than his own. He is not the monster that the Government and Katerina's attorney claim him to be. Moreover, the Court saw his impressive record of rehabilitation and good deeds and helping other people. That is the Brandon that I know. But as I say, he is a broken and humbled man.

26.   More importantly, this is not an academic exercise. His Mother's fate is in Your Honor's hands. She will literally die without Your Honor's help, and now with the recent announced state of emergency concerning the Coronavirus, she is in that category of the most vulnerable, especially if one of her aides came into contact with someone on the bus or train and gave it to her. Brandon even had one of the Spanish guys here prepare a sign about the virus to put on her door. I know this first hand from having my loved ones speak to Charlotte and the few people left in Brandon's life who sadly cannot help him or his Mother, but do recognize how dire her situation truly is.

27.   I personally believe that Brandon has paid his "debt to society" several times over. For comparison, please see the case of Joseph Collins, who my attorney Michael Levy prosecuted, but the Judge felt a sentence of a year and a day was sufficient for Mr. Collins. Mr. Collins, like Brandon, was an attorney at the center of the REFCO scandal that cost 17,000 people $4 billion. Unlike the alleged fraud in this case where everyone has been paid back, including the Widow, none of the victims in REFCO were paid back in full. Unlike Brandon, Collins did not plead guilty or ever accept responsibility,

and had two trials and appeals over various issues. Brandon has pleaded guilty four times, and his two appeals really focus on Ineffective Assistance of Counsel. I wrote the Venue section of his appeal and would happily argue it for him.

28. That leads to another point. Brandon followed Your Honor's suggestion to have the Second Circuit appoint another attorney for his appeal. The Second Circuit refused. He has no money and his Mother's debt on her reverse mortgage that Alex Kopoulos and Richard Bivona stole, and is now approaching $1,000,000 with interest and penalties. Many days she goes hungry and must rely on the charity of strangers (including my wife). So, I volunteered to help on the appeal and even tried to get the son of one of my other attorneys that helped defend El Chappo (Jeff Einhorn). Unfortunately, Brandon has no one to argue for him, and the Court denied his Motion for Bail Pending Appeal. Therefore, I respectfully submit to the Court that the wrong message will be sent to the public if Charlotte Lisi dies and three years from now Brandon wins his appeal at the Supreme Court.

29. Respectfully, I feel uniquely qualified to say this because at Canaan, Devens, and now here at MDC Brooklyn, both inmates and staff alike know me to be a very religious person who communicates not just with the Catholics and Protestants, but with the Muslims and the Jews as well. The Court is welcome to inquire of Mr. Harper here at MDC, Father Zook who was at Canaan but then came to MDC, or even Rabbi Spritzer who comes to MDC every other week. The right thing to do on this case is to reduce Brandon's sentence to 19 months and order him to Home Confinement.

30. According to the BOP's Program Statement 5321.08: "A CCC (Halfway House) meets the definition of a penal or correctional facility in 18 U.S.C. §3621(b)." These words were written by Kathleen Hawk Sawyer, the director of the BOP, over 20 years ago.

31. Again respectfully, I personally believe a consecutive sentence in this case was Plain Error under §5G3.1(b). I would happily argue that point with Your Honor by mail, as every month I seem to find a new Court of Appeals case that supports my belief. But Charlotte Lisi's life hangs in the balance, and Your Honor clearly has the power to reduce Brandon's sentence to be served in a Halfway House or Home Confinement for whatever sentence the Court deems to be sufficient in the interests of justice. That would send a clear message for the purpose of general deterrence, but at the same time save the Widow Lisi's life. Isn't the Widow Lisi's life as important at the Widow Stein's $500,000, which has clearly been returned? At no time did Brandon ask the Court to get off "easy" or make this Court's decision a "nullity" as the Court suggests in its Opinion. The principle of general deterrence was served when this Court sentenced Brandon to a 38 month sentence; three times longer than Joseph Collin's sentence for being the attorney in the center of the REFCO fraud.

32. There are certainly people with bigger frauds that have received lesser sentences. But Brandon has continued to take care of his Mother despite her declining health, and despite being locked up for much longer than the five years originally expected. Certainly no one expected a cooperating witness for the Government to steal $250,000 from the Widow Lisi and then have the Government castigate Brandon for the theft of the Widow Stein's money by Zelin and Naiberg. At no time did Brandon represent the Widow Stein, and if Katerina received a USSG Amendment 794 Mitigating Loss

Adjustment, so too should have Brandon. This Court has ample reason to reduce Brandon's sentence even if his Mother was not dying. Both Amendments SGA 792 and SGA 794 support a reduction in sentence now to save his Mother's life. And if the sentence is served under Home Confinement, Brandon will still be under the BOP's custody.

33. But, now with the Coronavirus (COVID-19), the danger to Mrs. Lisi is even more dramatic and frightening. If normal, middle age healthy people are panicking, what will happen to Mrs. Lisi who cannot possibly fend for herself? Go to Walmart and Costco to stock up on day goods? The woman is paralyzed, and her son is her only possible means of life support. The Coronavirus alone would be reason for this Court to reduce Brandon's sentence to 19 months and have him serve it in the Brooklyn Halfway House pursuant to 18 U.S.C. §3621(b). That is all that Brandon wants: the benefit of the bargain from the Plea Agreement of April 16, 2013, and to be allowed to take care of his Mother. He never asked for Time Served. I did.

34. On the other hand, as the author of the Motion for Compassionate Release, I did borrow from successful §3582(c)(1)(A) decisions from across the country, from Chad Marks to Anthony Bucci, and from *Cantu* to *Walker*. I also borrowed language from the author of "Lawman", Shon Hopwood, who is now a professor of Criminal Law at Georgetown Law School. I respectfully implore this Court to resentence Brandon to Home Confinement based on whatever sentence this Court deems reasonable under the circumstances here, and pursuant to the §3553(a) factors as we have presented them; not as the Government has.

35.     I believe it is important for the Court to know that Brandon is a good man. I believe with all of my heart that he is innocent, not just technically, but actually. Your Honor said nice things about him at his September 2017 sentencing. Then, in March 2018, Katerina's attorney said some terrible things about Brandon. I know Brandon and I know Katerina. Whereas Brandon has yelled at me over some of my deletions and additions for this very Motion, he has never raised his voice to Katerina, much less his fist. Brandon is a "preppie" and a gentleman. He would never hit a woman. But please do not take my word for it, Your Honor. Instead, listen to the Government's cooperating witness who you pointed out to Katerina's attorney tells a far different story. So, too, does the alleged victim Paul Bibbo. Please see Katerina's Sentencing Transcript pages 24-26. Similarly, Bibbo's wife's Transcript pages 26-29. Also, one of the true fraudsters in this case, Alex Kopoulos, page 31 at line 19.

36.     Simply put, Brandon pleaded guilty to taking $150,000, but that money went to Naiberg and Zelin, not to him. Others profited from this alleged fraud, but not Brandon. Whatever new sentence this Court deems to be appropriate should be served on Home Confinement as this Court has the power to do, and please remember that §3582(a) even suggests that incarceration is not appropriate for the true goals of sentencing, which are rehabilitation and re-entry into Society. What purpose will be served by keeping Brandon in a Maximum Security prison while his Mother dies an agonizing death, alone, with no family around her? On the other hand, if Brandon's sentence is reduced to a year and a day like Joseph Collins, and he serves it on Home Confinement, her life can be saved and the general deterrence purpose of sentencing is still served. But, if Brandon pleaded guilty because his attorneys told him he would get a concurrent

sentence under §5G1.3(b) and he didn't, then he will be the next case to follow *Lafler, Frye, Lee,* and *Galanis*, but Mrs. Lisi will be dead. How does that serve Society or Justice?

37. Finally, Brandon's acceptance of responsibility has been real. Not because he feels he is guilty of some heinous crime, but because like most defendants he does not have a good attorney advising him because his attorneys told him he could get 10-20 years based on the Sentencing Guidelines if he went to trial and lost, which would have been a death sentence for his Mother. Now he is fearful that if he was to get resentenced by the Court, he would lose his acceptance of responsibility. I have told him that if he is resentenced, this Court will use the Guidelines in effect now, and the $1,500,000 will go down to $150,000 that he pleaded guilty to (see SGA 792 adopting Justice Gorsuch's opinion in *United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011)); as well as receiving a 4-level Mitigating Role Adjustment pursuant to SGA 794 and *United States v. Soborski*, 708 Fed.Appx 6 (2d Cir. 2017), so that his Offense Level will now qualify for Probation even though he has pleaded guilty. Please recall that Joseph Collins was the General Counsel of REFCO, a firm that defrauded 17,000 investors of $4 billion, and he got a year and a day after going to trial twice and never accepting responsibility. Therefore, we respectfully ask this Court for a reduction in Brandon's sentence for the reasons stated above, and to have this Court order that new sentence to be served on home Confinement under the BOP rather than in a Maximum Security prison.

I declare under the pain and penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing is to the best of my recollection true and correct.

Dated: March 12, 2020

Respectfully Submitted,
/s/ Daniel E. Carpenter
Daniel E. Carpenter
Declarant
Incarcerated Inmate
Reg. No. 90792-038
MDC Brooklyn
P.O. Box 329002
Brooklyn, NY 11232

No. 15-cr-00457

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**UNITED STATES OF AMERICA,**
**Respondent,**

**v.**

**BRANDON LISI**
**Petitioner.**

---

# MOTION FOR RECONSIDERATION OF THIS COURT'S DENIAL OF PETITIONER'S MOTION FOR REDUCTION IN SENTENCE AND/OR COMPASSIONATE RELEASE

---

Brandon Lisi
Petitioner, *Pro se*
Incarcerated Inmate
Reg. No. 62739-054
MDC Brooklyn
P.O. Box 329002
Brooklyn, NY 11232

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Respondent | ) | |
| v. | ) | CASE NO. 15-cr-00457 |
| | ) | |
| BRANDON LISI, | ) | |
| Petitioner | ) | |

## MOTION FOR RECONSIDERATION OF THIS COURT'S DENIAL OF PETITIONER'S MOTION FOR REDUCTION IN SENTENCE AND/OR COMPASSIONATE RELEASE

NOW COMES THE PETITIONER, Brandon Lisi (hereinafter the "Petitioner" or Mr. Lisi), to respectfully ask this Court to reconsider and amend its judgment denying Petitioner's Motion for Reduction in Sentence and/or Compassionate Release (Dkt. 218) pursuant to F.R.C.P. Rules 59(e) and 60(b). Reconsideration in this case is necessary to prevent a grave miscarriage of justice, which could clearly result in the death of an innocent woman: Petitioner's Mother. In its denial of Compassionate Release pursuant to 18 U.S.C. §3582(c)(1)(A), the Court concluded that it had the power to grant relief and that Petitioner's Mother, Charlotte Lisi's suffering qualified as "extraordinary and compelling" circumstances, but the Court felt that Petitioner was not accepting responsibility for his crime because he was appealing the Court's sentence. Respectfully, the Court misapprehends and misconstrues Petitioner's motivations and issues on appeal, and should therefore reconsider its decision and grant Mr. Lisi's Motion for Reduction in Sentence and/or Compassionate Release to Home Confinement or Halfway House as was done in *United States v. Walker*, No. 11-CR-270, (N.D. Ohio Oct. 24, 2019) and *United States v. Bucci*, 409 F.Supp.3d 1 (1st Cir. 2019) in the interests of justice.

## I.    PRELIMINARY STATEMENT

With the utmost respect, Petitioner implores the Court to review and reconsider its denial of Petitioner's request for a Reduction in Sentence to reflect the benefit of the April 16, 2013 Plea Agreement that he never saw. All seem to agree that if he had seen it, he would have taken the deal, received a 97 month sentence from Judge Buchwald, and none of these issues and arguments raised by the Government would be relevant or debatable. Simply put, if he had seen the Agreement, these issues like relevant conduct, concurrent sentences, or even acceptance of responsibility would NOT be debated. Though §3582(c)(1)(A) is referred to as "compassionate release", Petitioner's appeal is really just an attempt to reclaim the deal that he should have had with Judge Buchwald for a global settlement of all issues, or a concurrent sentence from this Court as all of the parties, properties, and principals related to the same conduct in all four cases. If the Court believes Judge Buchwald would have given Petitioner a sentence of 97 months, then it should reduce this Court's sentence to 19 months and order Petitioner to serve that time in a Halfway House or in Home Confinement; both of which are still serving a sentence under BOP custody. By doing so, this Court establishes a sentence that is sufficient, but not greater than necessary, to meet the goals of sentencing while giving Petitioner the opportunity to save his Mother's life as he remains under BOP custody.

Contrary to the Government's misguided arguments, Mr. Lisi does not need to serve his new sentence in a Monte Cristo-like Chateau d'If because, according to the BOP's own regulations, being part of the MDC Brooklyn Cadre, in a Halfway House, or under Home Confinement is exactly the same custody level. *See Levine v. Apker*, 455 F.3d 71 (2d Cir. 2006), *citing Goldings v. Winn*, 383 F.3d 17 (1st Cir. 2004). Perhaps the best description of this issue is Judge Ponsor's

decision in *Iacoboni v. United States*, 251 F.Supp.2d 1015 (D. Mass. 2003), which is very instructive of this principle:

> Indeed, the notion of "imprisonment" clearly encompasses conditions of confinement substantially less restrictive than community confinement. For example, §3624(c) authorizes the BOP to "assure that a prisoner serving a *term of imprisonment*" is given the opportunity to serve as much as six months of the final portion "*of the term*" in home confinement. *Id.* (emphasis supplied). In other words, Congress has recognized that an offender may serve a portion of a "term of imprisonment" while living at home, full time. Certainly, there is a substantial difference between the conditions facing an inmate in, say, a maximum security prison and one in a halfway house. The same may be said about the relative situations of an inmate placed in administrative segregation, an inmate at a prison camp, an inmate at a metropolitan detention center, an inmate at a "boot camp" program, or an imprisoned patient at a medical center. But the existence of these differences, however great they may be, does not diminish the character of the confinement to the extent that it is no longer "imprisonment." As the Supreme Court recognized in *Koray*, the critical litmus is whether offenders "always remain subject to the control of the Bureau." *Reno v. Koray*, 515 U.S. 50, 63 (1995). Offenders imprisoned in community confinement are subject to BOP control. They are, as Chief Justice Rehnquist noted, "subject to BOP's disciplinary procedures; they are subject to summary reassignment to any other penal or correctional facility within the system, and, being in the legal custody of BOP, the Bureau has full discretion to control many conditions of their confinement." *Id.* BOP control is the touchstone of "imprisonment," and the BOP exercises complete control over all offenders placed in community corrections. They are imprisoned. Finally, the argument that the BOP, in exercising its Congressionally-bestowed discretion to designate as the "place of the prisoner's imprisonment...any available penal or correctional facility," §3621(b), is, in effect, *failing* to "imprison" the offender when it designates him or her to a community corrections facility simply ignores §3551, which can only be read to include community confinement as a form of imprisonment, the last category of the three "authorized sentences." Thus, as a matter of law, and a matter of common sense, the argument that community confinement is not a form of imprisonment will not wash. *Id.* at 1029.

Therefore, this Court can do the same thing that other judges have done across the country by reducing Mr. Lisi's sentence to whatever level this Court feels adequate, and order him to serve the remainder of his sentence under BOP Custody at the Halfway House in Brooklyn (which is overcrowded), or under Home Confinement, which is the same exact custody level as being in the Cadre at MDC Brooklyn but with the additional benefit that Petitioner can save his mother's life. *See* May 2013 Letter from Blake Davis to All Wardens attached as Exhibit One.

Contrary to the Government's spurious allegations in its Opposition Brief (Gov. Opp.) as to Acceptance of Responsibility, the Government is clearly wrong on that score because Mr. Lisi is only saying that he is entitled to the same "Effective Counsel" that every other American is guaranteed. *See Lafler* v. *Cooper*, 566 U.S. 156 (2012), *Missouri v. Frye*, 566 U.S. 134, 149 (2012), and especially *Lee v. United States*, 137 S.Ct. 1958 (2017), which are all cited in the Second Circuit's recent decision in *United States v. Galanis*, 759 Fed.Appx. 88 (2d Cir. 2019).

*Galanis* is particularly instructive for this Court's review of its decision, because Petitioner's former attorney Lisa Scolari failed to tell the defendant in *Galanis* about a plea agreement in his co-defendant's case, and he ended up getting a much longer sentence than he should have, and a consecutive sentence that he should not have had, all because of Attorney Scolari's errors. *Galanis* provides all that this Court needs to reconsider its decision and amend its judgment to grant relief in sending Mr. Lisi to a Halfway House or Home Confinement, both of which are still under the custody of the BOP. Moreover, not only does Mr. Lisi have the lowest PATTERN Score at MDC Brooklyn because of all of his classes (both taken and taught), he is Community Custody and has a Zero Points Custody Level Score with a Negative Four Variance. As this Court has already decided that Mr. Lisi is not a danger to the community, the Court should take comfort that he has had a spotless record in prison with no Infractions, and the Court can review all of his prison accomplishments in the package he sent to the Court. (See Dkt. 217).

Therefore, since the Court believes it has the power to reduce Mr. Lisi's sentence under the First Step Act, and his Mother's situation constitutes "extraordinary and compelling" circumstances, Petitioner respectfully asks this Court to reconsider the §3553(a) factors and reduce his sentence to whatever amount of time the Court deems fair and in the interests of justice under the BOP's custody for the reasons detailed below. In that way, the Court can send its message of

general deterrence by keeping Petitioner under BOP Custody in either a Halfway House or Home Confinement, while at the same time helping to save Charlotte Lisi's life. Please see the Declaration of Daniel Carpenter in Support of this Motion for Reconsideration attached as Exhibit Two.

## II.  LEGAL STANDARD

Fed. Rul. Civ. P. 59(e) permits a party to move to alter or amend a judgment within 28 days from the entry of the judgment. Although the Rule does not specify what grounds justify an amendment or reconsideration of a judgment pursuant to F.R.C.P. 60(b), both Rule 59(e) and Rule 60(b) are inherently equitable in nature and provide the Court with great latitude to change its mind in the interests of justice and to prevent a manifest injustice. A court may "reconsider an earlier decision when it is confronted with an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *See United States v. Becker*, 502 F .3d 122, 127 (2d Cir. 2007), *quoting United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000). Subsection (b)(6)—the catch-all provision of Rule 60(b)—"allows courts to vacate judgments whenever necessary to accomplish justice...." *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009) (*citing Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847, 863 (1988).

A motion for reconsideration also serves a valuable function, where the Court "has patently misunderstood a party or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning, but of apprehension." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269-70 (7th Cir. 1996). Moreover, most courts have long recognized the "inherent equitable powers of courts of law over their own process, to prevent abuses, oppression, and injustices." *Seattle Times Co. v. Rinehart*, 467 U.S. 20, 35 (1984). It seems beyond peradventure that those inherent powers of the court must include a judge's

power to correct his own decisions when they are clearly based on the government's misrepresentation of the law and/or the facts of any given situation as was done in this case.

Respectfully, all of these issues are readily apparent in the Court's denial of Mr. Lisi's Motion for a Reduction in Sentence and/or Compassionate Release pursuant to §3582(c)(1)(A), (Dkt. 218), and therefore this Court should exercise its discretion to reconsider its February 24, 2020 Order and grant the relief requested pursuant to §3582(c)(1)(A).

## III. ARGUMENT

### A. The Court Misapprehends Mr. Lisi's Appeal

Despite the Government's arguments to the contrary, Petitioner's Appeal is very straightforward and at no time alleges his innocence or contradicts his acceptance of responsibility. Far from it, the Supreme Court cases that Petitioner relies on for asserting his Ineffective Assistance of Counsel claims: *Lafler, Frye,* and *Lee,* are the very same cases that led the Second Circuit to vacate the defendant's sentence in *Galanis* and remand it back to the district court so Galanis could get the benefit of the deal he never saw, due to the ineffectiveness of Petitioner's attorney in this case, Lisa Scolari. Similarly, Petitioner's argument that he should have had a concurrent sentence because the post-arrest conduct is clearly related pursuant to U.S.S.G. §5G1.3(b) is not just substantiated, it is a meritorious argument that this Court should reconsider because not only is the "post-arrest" conduct clearly related, it is the exact same conduct that was covered by the global April 16, 2013 Plea Agreement that Petitioner never saw until Attorney Scolari sent it to him after he had already pleaded guilty in this case.

What more does this Court need for a *Lafler-Frye-Lee* analysis? Attorney Scolari had a much better plea agreement in her possession (or how could she send it to Ft. Dix?), she never discussed it with Petitioner (which is Ineffective Assistance of Counsel by any standard), much

less did any of the required analysis of the Plea Agreement that the Supreme Court says is required for counsel to be "Effective". This resulted in "prejudice" to Petitioner ("any amount of actual jail time is significant for Sixth Amendment purposes," *Glover v. United States,* 531 U.S. 198, 203 (2001)), so both prongs of *Strickland v. Washington,* 466 U.S. 668 (1984) are satisfied here. In *Lee*, no one ever contested Lee's acceptance of responsibility, and his conviction was vacated by the Supreme Court. Unlike the defendant in *Lee* who was caught red-handed with the drugs but was still able to negotiate an excellent year-and-a-day sentence, and still appeal to the Supreme Court to vacate his conviction and sentence, Petitioner is repeatedly subjected to unwarranted criticism by the Government quoting Judge Buchwald comments from eight years ago. Petitioner's Mother had a stroke in 2012, and her health has declined markedly since then. But, the Government, instead of agreeing that Petitioner had the worst attorneys on record including Randy Zelin and Scolari (*Galanis*), continues to say that Petitioner is not "contrite" enough and has not "accepted" responsibility, despite his guilty pleas in not one case (like in *Lee*), but four separate cases that should have been covered by the Global Plea Agreement of April 16, 2013 that neither attorneys Zelin nor Scolari showed or advised him of.

This is Ineffective Assistance of Counsel by any standard according to the Supreme Court in *Lee* and the Second Circuit in *Galanis*. Therefore, Petitioner should not be "prejudiced" a second time by having the Government object to his "compassionate" release to Home Confinement pursuant to §3582(c)(1)(A) and the First Step Act simply because he is appealing on the basis of Ineffective Assistance of Counsel, as do 10,000 other defendants year after year who pleaded guilty without question of their acceptance of responsibility; which is also not one of the relevant factors that should be considered in an §3553(a) analysis for the purposes of §3582(c)(1)(A). *See, e.g.,*

*United States v. Cantu*, 2019 WL 2498923 at \*1 (S.D. Tex. June 17, 2019), and *United States v. Bucci*, 409 F.Supp.3d 1 (1st Cir. 2019).

**B. The Court Should Reconsider Its Decision**

Petitioner respectfully requests the Court to review the opinion in *Cobb v. United States*, 2019 WL 2607002 (E.D.N.Y. 2019). In *Cobb*, Judge Allyne Ross admits she made a mistake in her review of the defendant's letter to the Court, and that she misconstrued his arguments about related conduct under §5G1.3(b), and admits that she should have reduced Cobb's sentence. The defendant in *Cobb* also suffered from Ineffective Assistance of Counsel, but unlike Petitioner, he did submit a 2255 Petition which Judge Ross denied but then reconsidered, admitted her mistake, and granted Cobb's Petition to reduce his sentence. Judge Ross provides not just a scholarly analysis of the law on motions for reconsideration and how to construe a Petitioner's *pro se* filings in quoting *Green v. United States*, 266 F 3d 78, 83 (2d Cir. 2001) and concluding that: "Construing Mr. Cobb's 2255 Petition liberally, he sufficiently raised the issue that his trial counsel was ineffective for failing to preserve and argue on appeal my §5G1.3(b) error." *Cobb* at \*2.

Like Petitioner, Cobb wrote several letters to Judge Ross which she discusses in her opinion. To her credit, Judge Ross has written a masterful opinion in Cobb that should be cited by *pro se* litigants everywhere as well as to be the model every judge should follow in tempering Justice with Mercy. "In deciding what sentence will be sufficient, but not greater than necessary to further the goals of punishment, a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017). Petitioner respectfully asks this Court to reflect on Cobb while reconsidering Petitioner's Motion.

## C. Petitioner Merely Seeks Halfway House and/or Home Confinement as well as a Fair Sentence

In his October letter to the Warden, Mr. Lisi made it clear that if he was unsuccessful in saving his Mother's life, he would **return to prison**. He also sent numerous letters to the Court asking for Home Confinement to help his Mother with the same caveat he promised the Warden. More importantly, according to the Second Circuit in *Levine v. Apker*, 455 F.3d 71 (2d Cir. 2006) *citing Goldings v. Winn*, 383 F.3d 17 (1st Cir. 2004), there is no difference in "Custody Level" between Petitioner serving his 38 month sentence in a Camp, a Halfway House, or under the BOP's custody in Home Confinement as Blake Davis made clear in his May 2013 Memo to all Wardens, and as Director Kathleen Hawk Sawyer made clear in 1998 and 1999 in BOP Program Statement 5321.08 (A CCC [Halfway House] meets the definition of a penal or correctional facility pursuant to 18 U.S.C. §3621(b)).

When someone is in a Halfway House or Home Confinement, they are still in BOP Custody. In fact, the November 2016 OIG Report criticized the BOP for not utilizing the Home Confinement option more, as there is no difference from a custody standpoint between a Camp, a Halfway House, or Home Confinement. The individual is still "imprisoned" under the BOP's Custody. Also, pursuant to the First Step Act and the new §3624(g)(10), there is now no limit to the length of time that an individual can serve on Home Confinement or in a Halfway House. If this Court reduced Petitioner's sentence to 19 months pursuant to the April 16, 2013 Plea Agreement that he never saw, and allowed him to take care of his Mother, that would be fair and equitable for all involved. But, instead, the Government continues to disparage Petitioner with false claims rather than addressing the Ineffective Assistance of Counsel claims and mistakes made by Petitioner's various attorneys throughout this entire prosecution. Petitioner has even offered to come back to prison. See Exhibit A, Part 3 (pg.3) of Dkt. 217.

10

Petitioner never required time served, he only wanted the benefit of the bargain that he was never shown, i.e. the April 16, 2013 Plea Agreement. Alternatively, he merely requested a credit of 18 months for the time he served on strict house arrest because he was never given a bail hearing (bail modification hearing). (See 12/12/12 Tr. of appearance before Judge Buchwald and Judge Swain, wherein the bail hearing was adjourned but no follow up hearing was ever conducted). The point being that Petitioner was simply asking of this Court for his sentence to be reduced to reflect the April 16, 2013 Plea Agreement and the Sentencing Guidelines (Reduction In Sentence), in order that he be given some relief out of compassion to get him home sooner to his Mother, and NOT "time served," but instead that he be sentenced to a sentence of no more than 19 months "consecutive" to Judge Buchwald's sentence (if not given a "concurrent" sentence) as a Reduction in Sentence from Your Honor's sentence of 38 months. Moreover, Petitioner has offered to come back to jail if he fails to save his Mother's life. He prays to go home and take care of his Mother, and not to live life as a free man under time served.

### D. Petitioner's Record While Incarcerated has been Exemplary

The Government, in its Opposition Brief to Petitioner's Appeal, concedes (and is therefore estopped from arguing now) that this Court found he had accepted responsibility and had done good things in prison to rehabilitate himself. *See, e.g.*, Gov. Opp. at page 23: "Judge Failla went on to discuss the good Mr. Lisi has done and in particular took note of his exemplary conduct while in prison, his efforts at rehabilitation, and his care for his mother. (A.280)." Therefore, these facts are now clearly subject to the Law of the Case Doctrine, and the Government is therefore estopped from arguing against and should not be allowed to contradict this Court's clear findings to the contrary from September 2017, now almost three years later; especially in light of the Government's waiver and agreement that Mr. Lisi had accepted responsibility and had done good

things with his time in prison. (See Govt. Opp. Br. on Appeal 17-3185 at p. 23). Had Petitioner received a concurrent sentence in September 2017, and been allowed to be at a Camp with RDAP, all parties can agree that he would be home right now helping his Mother in the wake of the Coronavirus rather than debating old and decided issues with the Government.

Moreover, even a cursory glance by the Court at Petitioner's record in prison would show that he has participated in thousands of hours of BOP sponsored programs. Not only has Petitioner taken BOP courses, he has taught them as well. At Fort Dix, he was the Law Librarian Clerk. Significantly, Mr. Lisi was also allowed to create a curriculum of classes with Mercer Community College that would have allowed inmates to earn college credits while in prison. In the Exhibits included with the Declaration in Dkt. 217 there are numerous distinctions. But, unlike other successful compassionate release candidates (*e.g. Cantu, Bucci,* and *Walker*), Petitioner has an unblemished and spotless record in prison which should inure to his benefit in the §3553(a) calculation. At Petitioner's original sentencing, this Court spoke well of his many good deeds while in prison, and that point should not be lost: that he used his "in prison" time wisely to benefit others, as was described by the judges who granted relief in *Walker* and *Cantu*.

### E. The Widow Lisi Deserves this Court's Compassion, Help, and Protection

In this Court's denial of Petitioner's Motion for a Reduction in Sentence and Compassionate Release, it focuses on one of the victims in this case being a Widow. But Petitioner's mother, Charlotte Lisi, is also a widow and victim of fraud. In fact, the $250,000 that Mrs. Lisi set aside for herself from the proceeds of a reverse mortgage that she took against the home she currently lives in so that she would and could be taken care of while her son was in prison, was stolen by Richard Bivona, a witness against Petitioner in this case ***and*** the fraudster Alex Kopolous, who was used as a government witness and is listed as a "victim" in Petitioner's Restitution Schedule.

So, in a very "Orwellian" context, some widows appear to be "more equal" than others. The Widow in this case has been paid back her $500,000, but the facts are indisputable. Petitioner never represented the Widow; a friend of attorneys Randy Zelin and Eric Naiberg by the name of Alex Constantopes did; and they all told their client, the Widow, that it was perfectly fine to put her $500,000 into a project where some of the funds ($150,000) would be used to pay Attorneys Zelin and Naiberg to represent Petitioner in his defense in this case. Petitioner never received a dime of the Widow's money. This is not just a classic "conflict of interest" which is *per se* Ineffective Assistance of Counsel. If anyone defrauded the Widow, it was Zelin and Naiberg; not Petitioner.

Unfortunately for the Widow Lisi, the same government that pounds the table for justice for the Widow in this case (who has been paid back the full $500,000) and continually castigates and defames Petitioner, has done nothing to bring Alex Kopolous to justice for defrauding the Widow Lisi of literally her life savings and has actually been protecting this rogue from prosecution. Therefore, unlike the Widow in this case that has received all of her money back and is living comfortably in a warm house, the Widow Lisi is starving and living without heat in a condemned home, filled with Black Mold, that is being foreclosed upon because the Government does not wish to prosecute Alex Kopolous for the outright fraud and theft of the Widow Lisi's $250,000. This Court should therefore respectfully temper its justice for one widow, by showing mercy to the son of another widow.

## CONCLUSION

For the reasons stated above, Petitioner respectfully requests this Court grant his Motion for Reconsideration, reduce his sentence, and grant him Halfway House and/or Home Confinement to serve the remainder of his sentence so that he may care for his ailing Mother.

Dated: March 12, 2020

Respectfully Submitted,

/s/ Brandon Lisi
Brandon Lisi
Petitioner, Pro se
Incarcerated Inmate
Reg. No. 62739-054
MDC Brooklyn
P.O. Box 329002
Brooklyn, NY 11232

# EXHIBIT
# ONE

May 24, 2013 Letter from Blake Davis to All Wardens




U.S. Department of Justice

Federal Bureau of Prisons

_____

Washington, D.C. 20534

## MAY 24 2013

MEMORANDUM FOR REGIONAL DIRECTORS
                   WARDENS
                   RESIDENTIAL REENTRY MANAGERS

FROM:       Blake R. Davis, Assistant Director
              Correctional Programs Division

SUBJECT:    Guidance for Home Confinement and Residential
              Reentry Center Placements

This memorandum is a compilation of previous guidance memoranda, policy, and practices regarding home confinement and Residential Reentry Center (RRC) placement decisions, as they relate to current policy, practice, and changes which were necessitated by the passage of the Second Chance Act of 2007. The intent of this memorandum is to reemphasize and clarify established policies and practices to facilitate effective community placements.

## I.  GUIDING PRINCIPLES FOR EFFECTIVE COMMUNITY PLACEMENTS

The Bureau's RRC resources continue to be limited and must be focused on those inmates with the greatest need and the highest risk of recidivism. Program Statement 7310.04, _Community Corrections Center Utilization and Transfer Procedures_, requires that RRC placements be made based on assessments of inmate needs for services, public safety, and the necessity of the Bureau to manage its inmate population responsibly. The Second Chance Act emphasizes the requirement that all inmates are eligible for pre-release RRC placement consideration and are to be assessed on an individual basis.

An individual inmate assessment is the primary means by which we determine an inmate's need and risk level. Research indicates that inmates with low needs and a low risk of recidivating who are placed in an RRC do not benefit from the placement and could become more likely to recidivate than if they received no placement.

In accordance with the Bureau's mission to ensure public safety, each inmate must be thoroughly evaluated based upon their need for reentry services, as well as perceived risk for recidivism and risk to the community. This was previously outlined in the June 24, 2010, memorandum "Revised Guidance for Residential Reentry Center Placements," and the April 14, 2008, memorandum "Pre-Release Residential Reentry Center Placements following the Second Chance Act of 2007."[1] When contemplating an inmate's appropriateness for community placement, staff should continue to follow current policy and practice and consider public safety while determining an inmate's need for reentry services. This will help determine whether or not receiving reentry services might mitigate those public safety concerns in the long run. For example, some higher risk inmates may initially appear to be inappropriate for referral to an RRC. However, when you thoroughly weigh the potential for increased risk of recidivism of a street release versus release through an RRC, it may in fact be in the best interest of public safety to refer the inmate to the RRC.

Accordingly, every effort should be made to consider community placements for inmates with manageable medical and mental health needs. These placements can help mitigate the potential increased recidivism risk of sending an inmate with these needs directly to the community. A community placement provides more expedient access to resources to address the specialized needs of these populations. Staff must take the steps necessary to facilitate these placements.

For low need/low risk inmates, home confinement is the preferred pre-release option. This option is currently under-utilized. Program Statement 7320.01, Home Confinement, states supervision under home confinement may be provided by contract halfway house services, U.S. Probation or other government agencies.

---

1 See Sallyport, Correctional Programs Division, Correctional Programs Branch, CPB Topics "RRC"

This is normally accomplished via two home confinement options – placement under the supervision of an RRC or placement in the Federal Location Monitoring (FLM) program operated by U.S. Probation, where available. We must make a concerted effort to utilize these effective community placement options for appropriate inmates. In addition to reintegrating inmates more quickly into their communities, maximizing the use of home confinement for appropriate inmates will help mitigate our critical population/capacity issues.

Residential Drug Abuse Program (RDAP) graduates who successfully complete the institution-based portion of the RDAP will continue to be assessed for pre-release RRC placements according to the guidance in P7430.02, <u>Community Transitional Drug Abuse Treatment</u>.

Wardens and Residential Reentry Managers (RRMs) play a vital role in ensuring an effective assessment process for inmates' community placements. This memorandum highlights the major elements of an effective RRC and home confinement utilization strategy.

## II.  MAKING AN APPROPRIATE RRC REFERRAL

As clarified in the June 2010 memoranda noted above, the Second Chance Act states that while all inmates are statutorily eligible for pre-release community placement, not all will be appropriate. Inmates must continue to be individually assessed for their appropriateness for and the length of pre-release RRC placements using the following five factors from 18 U.S.C. § 3621(b) and outlined in the April 2008 and June 2010 memoranda:

    (1) The resources of the facility contemplated;
    (2) The nature and circumstances of the offense;
    (3) The history and characteristics of the prisoner;
    (4) Any statement by the court that imposed the sentence:
         (a) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
         (b) recommending a type of penal or correctional facility as appropriate, and
    (5) Any pertinent policy statement issued by the U.S. Sentencing Commission.

When reviewing the above factors, staff should continue to consider the inmate's need for reentry services, public safety

concerns, and the need to responsibly manage the Bureau's inmate population.

Staff should also continue to thoroughly assess inmates' individual reentry needs when considering the appropriate duration of an RRC placement as outlined in the above referenced memoranda, current policy, and practice. A placement less than 90 days is typically not considered sufficient to address multiple reentry needs. In many cases, a placement of several months up to the maximum of one year[2] may be needed to accomplish an inmate's reentry goals. For example, an inmate with no recent employment, no GED, and poor family ties would benefit more from a one year placement than an inmate who has a short sentence, employment prospects, a high school diploma, and frequent family contacts. The number of placement days should be driven primarily by the inmate's needs and risk level (as determined by the BP-338 Custody Classification assessment or BP-337 Security Designation assessment if a BP-338 has not been completed).

The BP-338 is the Bureau's primary risk prediction instrument. Ordinarily, the lower the BP-338 score, the lower the inmate's risk; conversely, the higher the score, the higher the inmate's risk. Those with lower risks should be considered for home confinement placement and those with higher risks should be considered for RRC placement.

It is important to note that in many areas, the Bureau continues to have contracting options available to utilize the more secure environment of a Work Release Center (e.g., county jail/detention center) as a community placement. This may be the most appropriate placement option for inmates who may require closer supervision than an RRC. Institution staff should contact the applicable RRM to determine if this option is available in the area where the inmate is releasing for cases that may be deemed inappropriate for a traditional RRC.

If an inmate is truly not suitable for transfer to an RRC prior to release, staff have the option of contacting the USPO to discuss a possible public law placement wherein the judge places the individual in an RRC after their release from Bureau custody as a condition of supervised release.

---

2 See Title 18 U.S.C. § 3624(c)(1).

## III. MAKING AN APPROPRIATE REFERRAL FOR DIRECT HOME CONFINEMENT (PRE-RELEASE)

As outlined in P7320.01, Home Confinement, and per 18 U.S.C. § 3624(c) (1), all inmates are eligible for home confinement consideration at their six-month or 10 percent date. When considering an inmate for pre-release community placement, the unit team should pay special attention to reviewing low and minimum security inmates for possible direct placement on home confinement as allowed under P7320.01, Home Confinement. Higher security inmates may be considered if deemed appropriate following an individual assessment. The basic criteria for home confinement includes:

1) Appropriate release residence (e.g., positive environment free from criminal/drug use activity and a reasonable distance from the RRC, typically less than 100 miles);
2) No recent major disciplinary issues. This should be based on sound correctional judgment;
3) Any medical or mental health needs that can be met in the community and funded by the inmate or other documented resources, and
4) Secured employment is not required for placement on home confinement.

Placement should occur as close to the home confinement eligibility date as possible. The direct home confinement referral is not contingent upon USPO residence approval. A site visit should be requested during the referral process, but should not delay the submission of the referral to the RRM.

As part of their routine duties in processing inmate referrals, RRM staff will determine if placement will be via an RRC contract or FLM. In judicial districts where FLM is available, RRM staff should consider this option for appropriate inmates to the maximum extent possible.

## IV. RRM STAFF REVIEW OF RRC/HOME CONFINEMENT REFERRALS

RRM staff will continue to thoroughly review referral documents and other pertinent information for each community placement referral. RRM staff are encouraged to maximize resources to include recommending direct placement on home confinement for appropriate inmates.

The RRM is required to review home confinement eligible inmates in RRCs every two weeks and follow-up with RRC contractors within three working days (of receipt of the biweekly status report) to ensure RRC staff have (as part of the individualized program plan for the inmate) documented an appropriate plan of action with target dates to achieve home confinement placement. This follow-up time frame is a slight reduction from the June 2010 memorandum referenced above which required a weekly review. In locations where RRC bed space is limited, ensuring an inmate's timely placement on home confinement will help address capacity issues and also ensure more inmates are afforded RRC services. This area will be carefully reviewed for compliance during operational reviews and program reviews.

As previously indicated in the June 2010 memorandum, RRM staff will not unilaterally deny RRC referrals or reduce placement dates unless there are no available RRC beds within a reasonable distance for the specific referral date/length.

## V. COORDINATION BETWEEN INSTITUTION STAFF AND RRM/CTS STAFF

As the subject matter experts for their assigned location, RRM and Community Treatment Services (CTS) staff assist institution staff in making community placements. They provide information regarding available resources and discuss specific cases with institution staff as needed during the referral process and prior to the inmate's transfer to the RRC or placement on direct home confinement. It is important for institution and RRM staff to collaborate with CTS staff to ensure inmates with drug, mental health, or sex offender treatment needs have community-based treatment available in the vicinity of the placement.

If RRM staff have concerns regarding a referral and/or the recommended placement, they will communicate these concerns to the referring institution, typically the Case Management Coordinator (CMC).

If the RRM determines a modification to a referral is needed or that other placement options are available (such as direct home confinement for an inmate with low needs/risk or placement in a work release program for a higher security inmate), the change must be approved by the Warden. The RRM will contact the referring institution's CMC and request the recommended modification be considered. The CMC will facilitate the

Warden's review of the request and advise the RRM accordingly. Modifications can occur with the Warden's consent.

Conflicts regarding modifications to referrals should be addressed by institution management staff with the applicable Regional RRM Administrator. (Note: RRM Sector Administrators will assume this responsibility once the nationwide consolidation of RRM is completed. Contact information will be disseminated to institutions accordingly.)

If institution staff determine an inmate is not appropriate for RRC placement, the inmate's release should be carefully coordinated with U.S. Probation or Court Services and Offender Supervision Agency (for DC Code inmates). Such efforts should include the transmission of pertinent mental health and medical information and any other factors that could impact the effective reentry of the inmate to the supervising authority.

## VI. SUMMARY

- Community placements should be driven by the results of an inmate's individual assessment.
- RRC placement and length of placement decisions cannot be reduced solely to a classification score or any other type of objective categorization. While staff assessment and analysis of the Custody Classification Form (BP-338) and the ISD Plan are helpful in establishing broad-based groupings, staff must continue to exercise their professional judgment when making individual inmate RRC placement decisions and be prepared to justify those decisions. When making RRC placement decisions, staff should ensure the BP-338 and ISD Assessment have been completed accurately.
- All inmates are eligible for home confinement. Direct placement on home confinement should be considered for low and minimum security inmates. In judicial districts where FLM is available, RRM staff should consider this option for appropriate inmates to the maximum extent possible.
- RRMs will continue to be required to review home confinement eligible inmates in RRCs on a regular basis as set forth above. In locations where RRC bed space is limited, ensuring an inmate's timely placement on home confinement will help address capacity issues and also ensure more inmates are afforded RRC services.

- Every effort should be made to consider community placements for inmates with manageable medical and mental health needs. A community placement provides more expedient access to resources to address the specialized needs of these populations. Staff must take the steps necessary to facilitate these placements.

Your assistance in maximizing the RRC/home confinement utilization process is greatly appreciated. If you have any questions, please do not hesitate to contact me or have your staff contact Brent Kiser, RRM Administrator, at 202-305-8906.

# EXHIBIT
# TWO

Declaration of Daniel Carpenter in Support
of Petitioner's Motion for Reconsideration

# UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 15-CR-457 (KPF) |
| | ) | |
| BRANDON LISI, | ) | |
| Defendant | ) | |

## DECLARATION OF DANIEL CARPENTER IN SUPPORT OF PETITIONER BRANDON LISI'S MOTION FOR RECONSIDERATION

I, Daniel Carpenter, make this Declaration pursuant to 28 U.S.C. §1746 and state as follows under oath:

1.  My name is Daniel Carpenter and I am currently an inmate at MDC Brooklyn.

2.  I am submitting this Declaration in support of the Petitioner, Brandon Lisi's new Motion for Reconsideration asking this Court to reconsider its denial of his motion for a Reduction in Sentence and/or Compassionate Release.

3.  I am the author of Brandon's Motion for a Reduction in Sentence and/or Compassionate Release pursuant to 18 U.S.C. §3582(c)(1)(A). I am solely responsible for the language that the Court takes exception to in its denial of Brandon's Motion. See, e.g., Page 13 of Dkt. 218, the Court's decision. I also believe that Brandon is innocent of the crimes charged in the Indictment, and that he is the victim of both egregious prosecutorial misconduct and Ineffective Assistance of Counsel. But, for the purposes of this Motion, I also believe that I have significant knowledge of the facts of this case that the Court needs to hear in order to make an informed decision in the interests of justice. I can categorically state for the record that Brandon has accepted responsibility for his actions, and he is indeed contrite and not "crying Wolf" or using his Mother's dire

1

condition to garner the sympathies of the Court. That said, he is entitled to Effective Counsel like every other American, and he did not receive that. Nor did he receive a fair or appropriate sentence pursuant to the April 16, 2013 Plea Agreement that I can guarantee to the Court he never saw until it was too late, and he had already pleaded guilty. In his Motion, he is not asking to get his plea back or proclaiming his innocence, but rather he begs this Court for a reduced sentence based on the April 16, 2013 Plea Agreement and to serve that sentence under BOP Custody on Home Confinement or in the Brooklyn Halfway House, rather than in a Maximum Security prison like MDC Brooklyn. This Court clearly has the power to grant the relief that Brandon seeks, and therefore as the author of the Motion, I respectfully beg this Court to temper its justice with mercy and to reduce Brandon's sentence to some amount of time on Home Confinement, which is exactly the same custody level as being in the Cadre here at MDC, but with the added advantage that he can save his Mother's life.

4. I first met Brandon at the Camp of USP Canaan in June 2014. I also met his girlfriend Katerina Arvanatakis at that time because she would come to visit him at Canaan.

5. Often on visiting days, my wife and I would sit next to them or close to them, so it was not difficult to overhear other inmate's conversations. In fact, it was impossible not to.

6. I mention this to the Court because I never saw Brandon so much as even raise his voice to Katerina. To the contrary, he always referred to her as his "Greek Girl" because my Bunkie at Canaan was truly Greek and could converse with her in Greek. There was no doubt in my mind that Brandon and Katerina were a loving and affectionate couple. The allegations made by Katerina's attorney at her sentencing are not just false, they are defamatory as far as I am concerned.

7.  The reason I need to raise this issue before the Court is that I am the author of Brandon's Motion for a Reduction in Sentence and Compassionate Release so he can help his Mother. I am literally responsible for every single word in Brandon's brief, so if the Court or the Government has a problem with the tone of the brief, it is solely my fault and not Brandon's.

8.  I am familiar with the facts of this case because Brandon and I talked extensively about his case with Judge Buchwald at Canaan. Because I was blessed to have excellent attorneys who had helped me in the past, I arranged to have such distinguished attorneys as Alan Dershowitz and Marc Fernich review his case. They agreed with my analysis that Brandon was innocent of any crime and that he never should have pleaded guilty. If the Court feels that Brandon is not contrite or refusing to "accept" responsibility, that is because of my beliefs expressed in the Motion, not Brandon's.

9.  Filing the Motion for a Reduction in Sentence/Compassionate Release was all my idea to help Brandon get back to his Mom. I also helped Brandon with his appeal to the Second Circuit. I am also the author of Brandon's Motion for Reconsideration.

10. This will probably come as a surprise to the Government because they know that Brandon helped dozens of inmates at Fort Dix (where he was legendary in helping everyone around him, especially the illiterate); he is truly a kind soul seeking forgiveness. The staff here have even come to Brandon to ask questions about the implementation of the First Step Act. Brandon has worked with numerous inmates here to get them out early as Elderly Offenders. He helps the elderly and literally donates all of his time to helping others.

11. So why would Brandon use me to draft his §3582(c)(1)(A) Motion for a Reduction in Sentence? The answer is very simple: No one in the country has done as many §3582(c)(2) Motions for a Reduction in Sentence as I have. When I was at Canaan, Brandon knew that I helped dozens of inmates with gun and drug charges to do motions pursuant to §3582(c)(2) because of Amendment 782 to the Sentencing Guidelines. Of the inmates I helped, most of them received a reduction in sentence or a generous increase in Halfway House time. The smallest reduction was 10 months, and up to 4 years of sentence reduction with 11 months of Halfway House time for someone who had served 8 years of a 15 year sentence. He hugged me in front of all the inmates as he was walking out the door. Brandon saw many of these success stories before he was sent to the SHU and Fort Dix because of the Indictment in this case.

12. Brandon met Attorney Marc Fernich because of me, and Marc Fernich came to Canaan to meet with Brandon at no charge to review his case because my attorney in Boston, Marty Weinberg, asked him to do that as a favor for a friend of Dan's.

13. Marty had been working on a famous case in New York with Marc Fernich, and I had email correspondence with Marty this very week asking him to help a friend of mine at Fort Devens with his motion for compassionate release since I am not there any longer. As I am sure that the Government is interfering with my mail as well as Brandon's, it should be no problem to check out the accuracy of my statement on Corrlinks.

14. I was introduced to Marty Weinberg by my first attorney in Boston, Professor Alan Dershowitz. The funny story was that Alan had to renew his law license to take my case, and when he came to argue my motion to dismiss in front of Judge O'Toole in

Boston (famous for the Boston Bomber case), it was standing room only. Every clerk and most of the attorneys in the Moakley Courthouse were there to hear Alan's arguments in my defense. When Judge O'Toole denied my motion to dismiss, Alan introduced me to Marty Weinberg to handle my defense. Judge O'Toole granted Rule 33 Motions twice after my trials in 2005 and 2008 which the Government appealed. Despite having served my sentence in the Boston case, I am still on appeal in the First Circuit. Before I reported to Canaan in June of 2014, I was indicted by the Government in a totally unrelated case in May of 2014, and my attorneys in that case are Michael Levy and Jim Cole of Sidley. Mike was the former head of the Government Appellate Unit for the Second Circuit and Jim was the former Deputy Attorney General. Brandon heard from my wife that Alan told her that "Dan has done more 2255's than any attorney I know, including me."

15.    I say this as a backdrop because when I arrived at the Cadre Unit of MDC Brooklyn, it was late at night in early December, and I was greeted by several Canaan alumni including Brandon. For 3 hours that night he told me about his case. At that time, I decided that I would help Brandon and investigate the facts of the case myself as an objective observer. After reading the various filings that Brandon had in his possession (many other documents are missing or still in storage and inaccessible to Brandon despite this Court's orders to the contrary), I came to the conclusion that he was innocent and lacked the necessary criminal intent, but was in fact the victim of egregious Ineffective Assistance of Counsel; not just from Attorney Zelin, but Attorney Lisa Scolari as well.

16. I also decided to help Brandon because he is destitute. Any money he receives goes to phone calls to his Mother or to ask other people outside to help his Mother or to check in and see how she is doing. MDC Brooklyn is not a camp. It is truly a Maximum Security Prison where we are locked down every other week because of some fight or emergency on another floor. And if there was a problem that caused a lockdown on this floor, the Emergency Buzzers do not work in our cells.

17. Moreover, whereas I have been blessed with a loving wife and with some of the best attorneys in the country, Brandon is a true "basket case" between his lack of funds, limited resources, and concern for his Mother; he has no one on the outside to help him with his case or look after him. And, after I read the Government's attacks on Brandon's character and Katerina's attorney's malicious attacks on Brandon, I wanted to set the record straight and tell this Court about the Brandon I know.

18. I also have a couple of young guys on the outside that can help me with research, typing and filing of motions. Not only is the Law Computer here hopelessly behind the times for doing research, the one printer here is always out of paper or toner or doesn't work for some reason. There is no way to copy anything either. My young guys can type and file things for people here as a favor to me.

19. Brandon's attention is not on his legal arguments, but on his Mother's health and all the problems she has had lately. We have literally had arguments where I have wanted to play the role of Sidney Powell (Licensed to Lie) and go after the Government for its egregious prosecutorial misconduct in this case, whereas Brandon wants to tone things down because he lives in fear of Special Agent Smythe, the prosecutors, and even incurring the wrath of this Court as he clearly experienced with Judge Buchwald.

20.     Just so the Court knows, I will probably be helping Brandon with his 2255 in the Buchwald case as well, because I was the one that encouraged him to try to get his guilty plea back and argue about Attorney Zelin's ineffectiveness in that case. I apologize to the Court if my tone in the filings was too strident, but I have been fighting the Government in my own case since 2001, and I continue to fight in the First Circuit as well as the Second. Unlike me, Brandon has neither the will nor the means to fight. Not only is Brandon "contrite" and accepting responsibility, he is ultimately a broken man that has a spotless record in prison not just because he cares about his Mother, but because he spends all of his time helping other people without accepting so much as a tuna or a mackerel in payment.

21.     I can personally attest to the Court that Brandon is both contrite and accepting of responsibility. He is also more rehabilitated than the defendant in *Pepper v. United States*, 562 U.S. 476 (2011), and the BOP should use him as their poster child for rehabilitation.

22.     Contrary to the Government's malicious slanders, in his appeal Brandon seeks only to have the benefit of the April 16, 2013 Plea Agreement, which I can promise the Court he never saw, which is why I argue that what Attorney Lisa Scolari failed to do is *per se* Ineffectiveness of Counsel. I also believe that if the "Loss Mitigation Strategy" was what the illegality in this case involving post-arrest conduct, then that was all Attorney Zelin's fault. But, now that the Court knows that the selling of the historic Sag Harbor property, 6 Union Street, would have made everyone whole with no victims, I feel this Court has a duty to do justice and reduce Brandon's sentence and place him on Home Confinement to help his Mother. For the Government and Katerina's attorney to make

Brandon out to be a monster, rather than point out the picture of 6 Union Street Sag Harbor in the Mansion Section of the Wall Street Journal, is beneath the dignity of an officer of this Court. The picture provided to the Court is from my Wall Street Journal. I saw the ad and asked Brandon if this was the famous "Sag Harbor property" referred to in all the filings of this case.

23. I know the Court believes that Judge Buchwald would have set the sentence higher than 78 months based on the Global Settlement of the April 16, 2013 Plea Agreement. I respectfully disagree for a number of reasons. But, respectfully, because we are discussing the Plea Agreement that covers the same people, parties, principals, and properties, this means they are all related conduct and this Court's sentence should have been concurrent and not consecutive. Once again, my point is that Brandon should have had an Attorney secure an 11(c)(1)(C) agreement that would have been binding on this Court. Once again, that was malpractice and ineffectiveness on Attorney Scolari's part. Brandon has said that he did not even know about 11(c)(1)(C) until I told him about it in December of 2019.

24. But assuming the Court is correct that Judge Buchwald would have given Brandon the top end of the 78-97 month range, the April 16, 2013 Plea Agreement would have effectively limited the sentence of this Court to another 19 months. Brandon was merely stating the obvious in his appeal that he should have had the benefit of that April 16, 2013 Plea Agreement to limit this Court to 19 months, if not a concurrent sentence, pursuant to *Lafler, Frye,* and *Lee*. In fact, the Second Circuit's decision in *Galanis* which I found is directly on point.

25. To show how contrite Brandon really is, the Court need only look at page 3 of his October 16, 2019 letter to the Warden where he says he will gladly return to prison if he is unsuccessful in saving his Mother's life. These are not the words of an unrepentant, non-contrite person who refuses to accept responsibility. Far from it, he is the epitome of a contrite person that cares more for his Mother's well-being than his own. He is not the monster that the Government and Katerina's attorney claim him to be. Moreover, the Court saw his impressive record of rehabilitation and good deeds and helping other people. That is the Brandon that I know. But as I say, he is a broken and humbled man.

26. More importantly, this is not an academic exercise. His Mother's fate is in Your Honor's hands. She will literally die without Your Honor's help, and now with the recent announced state of emergency concerning the Coronavirus, she is in that category of the most vulnerable, especially if one of her aides came into contact with someone on the bus or train and gave it to her. Brandon even had one of the Spanish guys here prepare a sign about the virus to put on her door. I know this first hand from having my loved ones speak to Charlotte and the few people left in Brandon's life who sadly cannot help him or his Mother, but do recognize how dire her situation truly is.

27. I personally believe that Brandon has paid his "debt to society" several times over. For comparison, please see the case of Joseph Collins, who my attorney Michael Levy prosecuted, but the Judge felt a sentence of a year and a day was sufficient for Mr. Collins. Mr. Collins, like Brandon, was an attorney at the center of the REFCO scandal that cost 17,000 people $4 billion. Unlike the alleged fraud in this case where everyone has been paid back, including the Widow, none of the victims in REFCO were paid back in full. Unlike Brandon, Collins did not plead guilty or ever accept responsibility,

and had two trials and appeals over various issues. Brandon has pleaded guilty four times, and his two appeals really focus on Ineffective Assistance of Counsel. I wrote the Venue section of his appeal and would happily argue it for him.

28. That leads to another point. Brandon followed Your Honor's suggestion to have the Second Circuit appoint another attorney for his appeal. The Second Circuit refused. He has no money and his Mother's debt on her reverse mortgage that Alex Kopoulos and Richard Bivona stole, and is now approaching $1,000,000 with interest and penalties. Many days she goes hungry and must rely on the charity of strangers (including my wife). So, I volunteered to help on the appeal and even tried to get the son of one of my other attorneys that helped defend El Chappo (Jeff Einhorn). Unfortunately, Brandon has no one to argue for him, and the Court denied his Motion for Bail Pending Appeal. Therefore, I respectfully submit to the Court that the wrong message will be sent to the public if Charlotte Lisi dies and three years from now Brandon wins his appeal at the Supreme Court.

29. Respectfully, I feel uniquely qualified to say this because at Canaan, Devens, and now here at MDC Brooklyn, both inmates and staff alike know me to be a very religious person who communicates not just with the Catholics and Protestants, but with the Muslims and the Jews as well. The Court is welcome to inquire of Mr. Harper here at MDC, Father Zook who was at Canaan but then came to MDC, or even Rabbi Spritzer who comes to MDC every other week. The right thing to do on this case is to reduce Brandon's sentence to 19 months and order him to Home Confinement.

30. According to the BOP's Program Statement 5321.08: "A CCC (Halfway House) meets the definition of a penal or correctional facility in 18 U.S.C. §3621(b)." These words were written by Kathleen Hawk Sawyer, the director of the BOP, over 20 years ago.

31. Again respectfully, I personally believe a consecutive sentence in this case was Plain Error under §5G3.1(b). I would happily argue that point with Your Honor by mail, as every month I seem to find a new Court of Appeals case that supports my belief. But Charlotte Lisi's life hangs in the balance, and Your Honor clearly has the power to reduce Brandon's sentence to be served in a Halfway House or Home Confinement for whatever sentence the Court deems to be sufficient in the interests of justice. That would send a clear message for the purpose of general deterrence, but at the same time save the Widow Lisi's life. Isn't the Widow Lisi's life as important at the Widow Stein's $500,000, which has clearly been returned? At no time did Brandon ask the Court to get off "easy" or make this Court's decision a "nullity" as the Court suggests in its Opinion. The principle of general deterrence was served when this Court sentenced Brandon to a 38 month sentence; three times longer than Joseph Collin's sentence for being the attorney in the center of the REFCO fraud.

32. There are certainly people with bigger frauds that have received lesser sentences. But Brandon has continued to take care of his Mother despite her declining health, and despite being locked up for much longer than the five years originally expected. Certainly no one expected a cooperating witness for the Government to steal $250,000 from the Widow Lisi and then have the Government castigate Brandon for the theft of the Widow Stein's money by Zelin and Naiberg. At no time did Brandon represent the Widow Stein, and if Katerina received a USSG Amendment 794 Mitigating Loss

Adjustment, so too should have Brandon. This Court has ample reason to reduce Brandon's sentence even if his Mother was not dying. Both Amendments SGA 792 and SGA 794 support a reduction in sentence now to save his Mother's life. And if the sentence is served under Home Confinement, Brandon will still be under the BOP's custody.

33. But, now with the Coronavirus (COVID-19), the danger to Mrs. Lisi is even more dramatic and frightening. If normal, middle age healthy people are panicking, what will happen to Mrs. Lisi who cannot possibly fend for herself? Go to Walmart and Costco to stock up on day goods? The woman is paralyzed, and her son is her only possible means of life support. The Coronavirus alone would be reason for this Court to reduce Brandon's sentence to 19 months and have him serve it in the Brooklyn Halfway House pursuant to 18 U.S.C. §3621(b). That is all that Brandon wants: the benefit of the bargain from the Plea Agreement of April 16, 2013, and to be allowed to take care of his Mother. He never asked for Time Served. I did.

34. On the other hand, as the author of the Motion for Compassionate Release, I did borrow from successful §3582(c)(1)(A) decisions from across the country, from Chad Marks to Anthony Bucci, and from *Cantu* to *Walker*. I also borrowed language from the author of "Lawman", Shon Hopwood, who is now a professor of Criminal Law at Georgetown Law School. I respectfully implore this Court to resentence Brandon to Home Confinement based on whatever sentence this Court deems reasonable under the circumstances here, and pursuant to the §3553(a) factors as we have presented them; not as the Government has.

35.     I believe it is important for the Court to know that Brandon is a good man. I believe with all of my heart that he is innocent, not just technically, but actually. Your Honor said nice things about him at his September 2017 sentencing. Then, in March 2018, Katerina's attorney said some terrible things about Brandon. I know Brandon and I know Katerina. Whereas Brandon has yelled at me over some of my deletions and additions for this very Motion, he has never raised his voice to Katerina, much less his fist. Brandon is a "preppie" and a gentleman. He would never hit a woman. But please do not take my word for it, Your Honor. Instead, listen to the Government's cooperating witness who you pointed out to Katerina's attorney tells a far different story. So, too, does the alleged victim Paul Bibbo. Please see Katerina's Sentencing Transcript pages 24-26. Similarly, Bibbo's wife's Transcript pages 26-29. Also, one of the true fraudsters in this case, Alex Kopoulos, page 31 at line 19.

36.     Simply put, Brandon pleaded guilty to taking $150,000, but that money went to Naiberg and Zelin, not to him. Others profited from this alleged fraud, but not Brandon. Whatever new sentence this Court deems to be appropriate should be served on Home Confinement as this Court has the power to do, and please remember that §3582(a) even suggests that incarceration is not appropriate for the true goals of sentencing, which are rehabilitation and re-entry into Society. What purpose will be served by keeping Brandon in a Maximum Security prison while his Mother dies an agonizing death, alone, with no family around her? On the other hand, if Brandon's sentence is reduced to a year and a day like Joseph Collins, and he serves it on Home Confinement, her life can be saved and the general deterrence purpose of sentencing is still served. But, if Brandon pleaded guilty because his attorneys told him he would get a concurrent

sentence under §5G1.3(b) and he didn't, then he will be the next case to follow *Lafler, Frye, Lee,* and *Galanis,* but Mrs. Lisi will be dead. How does that serve Society or Justice?

37.   Finally, Brandon's acceptance of responsibility has been real. Not because he feels he is guilty of some heinous crime, but because like most defendants he does not have a good attorney advising him because his attorneys told him he could get 10-20 years based on the Sentencing Guidelines if he went to trial and lost, which would have been a death sentence for his Mother. Now he is fearful that if he was to get resentenced by the Court, he would lose his acceptance of responsibility. I have told him that if he is resentenced, this Court will use the Guidelines in effect now, and the $1,500,000 will go down to $150,000 that he pleaded guilty to (see SGA 792 adopting Justice Gorsuch's opinion in *United States v. Manatau,* 647 F.3d 1048 (10th Cir. 2011)); as well as receiving a 4-level Mitigating Role Adjustment pursuant to SGA 794 and *United States v. Soborski,* 708 Fed.Appx 6 (2d Cir. 2017), so that his Offense Level will now qualify for Probation even though he has pleaded guilty. Please recall that Joseph Collins was the General Counsel of REFCO, a firm that defrauded 17,000 investors of $4 billion, and he got a year and a day after going to trial twice and never accepting responsibility. Therefore, we respectfully ask this Court for a reduction in Brandon's sentence for the reasons stated above, and to have this Court order that new sentence to be served on home Confinement under the BOP rather than in a Maximum Security prison.

I declare under the pain and penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing is to the best of my recollection true and correct.

Dated: March 12, 2020

Respectfully Submitted,
/s/ Daniel E. Carpenter
Daniel E. Carpenter
Declarant
Incarcerated Inmate
Reg. No. 90792-038
MDC Brooklyn
P.O. Box 329002
Brooklyn, NY 11232